JAMES M. DILLARD *v.* THE STATE.

1. CRIMINAL LAW. *Continuance. On ground of prejudice. Showing therefor.*
    Where the application for a change of venue by a defendant in an indictment
    for murder, on the ground that such prejudice against him exists in the public
    mind of the county in which he is held for trial that he cannot have a fair

and impartial trial there, is supported by the affidavits of six persons, but twenty-four by-standers, from different parts of the county, testify that they know of no such prejudice, and that in their opinion the defendant can have a fair and impartial trial in that county, it is not error for the court to refuse to grant the application.

2. SAME.  *Arraignment.  After empanelling jury.  Objection.  Case in judgment.*
  D. was put upon trial for murder.  The special *venire* had been drawn, the jury empanelled, the witnesses sworn and placed under the rule, and the first witness for the State put upon the stand and his examination about to commence, when it was discovered that the minutes of the court did not show any arraignment of, or plea by, the accused.  He was then called upon to plead, but declined to do so, and "objected to an arraignment at this time, after the drawing of the special *venire* and the swearing of the jury."  His objection was overruled, and he was called upon to plead guilty or not guilty to the indictment, which he refused to do, and the court ordered a plea of not guilty to be entered for him.  To this action of the court the prisoner excepted.  He was convicted of manslaughter, and by writ of error brings the case to this court.  *Held,* that the action of the court below was correct.  The power to arraign the defendant was not lost by the improper empanelling of the jury before the arraignment.  And as the defendant, after arraignment, did not object specifically to being tried by the jury then empanelled, this court is precluded by sects. 2759 and 2843 of the Code of 1871 from considering the question that would have been presented by such objection.

3. SAME.  *Entry of plea by order of court.  Objection thereto.*
  It is not a good objection to the action of the court in calling upon the defendant in the case above stated to plead guilty or not guilty to the indictment, that he was thus debarred of the privilege of pleading in abatement, there being no suggestion on the part of the defendant that he desired to plead in abatement.

4. SAME.  *Dying declarations.  Foundation for evidence thereof.*
  In a trial for homicide, where the statements of the victim as to the circumstances of the difficulty in which he received his mortal wounds are offered in evidence as his dying declarations, if such statements were preceded by the declaration of the deceased that "he was bound to die," and "could not get well," they should not be excluded on the ground that "it was not shown that the deceased had no hope of recovery" at the time of making the statements.

5. SAME.  *Blood-stains.  Evidence thereof.  Chemical analysis.*
  In a trial for homicide, several witnesses for the State testified that, ten hours after the commission of the deed under investigation, they observed spots of blood upon the horse which the victim was riding at the time he received the mortal wounds.  The defendant objected to this evidence as incompetent, because the witnesses had made no chemical analysis of the substance supposed to be blood.  *Held,* that the evidence was competent.

6. **SAME.** *Examination of horse ridden by deceased. When admissible.*

Where the jury, in a case of homicide, were permitted to inspect the horse which the deceased was riding at the time he received his death-wounds, and to make experiments with the view of ascertaining whether the wounds could have been inflicted by a man standing on the ground, if the record fails to show that such examination and experimenting took place out of the presence of the court, or in the absence of the prisoner, it must be presumed that they were permitted by the court in the presence of the prisoner, and were therefore admissible as affording competent evidence.

7. **SAME.** *Flow of blood as evidence of position of combatants. Testimony of experts.*

In a trial for homicide, the shirt worn by the accused at the time of the fatal combat, which was covered with spots of blood, was produced in evidence, and the defendant proposed to ask several physicians, who were introduced as experts, to give their opinions as to the relative positions of the combatants during the fight, as indicated by the blood on the shirt, with the view, as stated, of showing by the blood-marks that the prisoner was probably prostrate on the ground and the deceased on top of him when the blood-stains on the shirt were received. The court refused to admit this testimony, on the ground that the matter to which it was directed was not one of science or technical skill, but of common experience and common sense, as to which the jury must judge for themselves. *Held*, that the action of the court below was correct.

8. **PRACTICE.** *Examination of witnesses. Repetition of testimony.*

It is improper for witnesses who have testified for the State in a criminal prosecution to be reintroduced to contradict the evidence of witnesses for the defendant by repeating their testimony already delivered; but the practice in such matters is largely within the discretion of the court, and where it does not appear that the admission of such repetitious testimony has done any injustice, it is not a good ground for reversal of a judgment.

ERROR to the Circuit Court of Lee County.

Hon. J. A. GREEN, Judge.

James M. Dillard was indicted for the murder of John Helms. The accused applied for a change of venue, on the ground that, " by reason of undue prejudice in the public mind " in the county where he was held for trial, he could not have a fair and impartial trial. The application was refused on the showing stated in the opinion of this court. The case then proceeded to trial.

The defendant made objections to the time and manner of his arraignment, and to the action of the court in ordering a plea entered for him, and took exceptions to the action of the

court in overruling his objections. The nature of the objections and the circumstances attending them are fully set forth in the opinion of the court.

Statements of Helms, made to several persons, were admitted in evidence as his dying declarations concerning the circumstances of the difficulty in which he received his mortal wounds. Exception was taken to the admission of this evidence, on the ground that it had not been shown that Helms had no hope of recovery at the time the declarations were made. The substance of those declarations touching the point of objection is stated in the opinion of the court. There were several other exceptions taken by the defendant to the admission or rejection of evidence, but the character of such evidence and the nature of the objections thereto are fully stated in the opinion of the court.

The evidence in the case establishes these facts: On the evening of the 5th of November, 1879, about dark, Dillard and Helms were going together towards their respective homes, the former walking and the latter riding on horseback. They were quarrelling when last seen or heard by any witness. In a short time thereafter Dillard called up some of the neighbors and informed them that he had cut a man with his knife, and he went with them and showed them the place of combat, and there they found Helms lying upon the ground, with several wounds upon him. Dillard had some scratches and slight bruises on his face. No person witnessed the combat. The parties had previously been friendly. The weapon used by Dillard was a pocket-knife. Helms was a stout man, physically; Dillard was rather weakly, and somewhat disabled by an old wound in the leg. The efforts of the defence seem to have been directed to the establishment of one or both of two facts: first, that Helms made the attack by striking Dillard with a piece of a railing; and, second, that when the cutting was done by Dillard he was down, with Helms on top of him. As to the circumstances bearing upon this theory, both sides produced evidence.

The jury rendered a verdict for manslaughter.   The defendant made a motion for a new trial.   One of the grounds of the motion was, as stated, that the jury had not been properly guarded, and had been exposed to improper influences.   Affidavits were presented on this question by both sides.   The motion was overruled, and the defendant sued out a writ of error.

*J. A. Blair*, for the plaintiff in error.

1. In the matter of the change of venue, I am not unmindful of the difficulties which environ a revision of the action of the court on that question.   It is very much a matter of discretion; but will not the court avert the wrongful effect of an abuse of discretionary power, if it is shown to be such? or are we at the mercy of the court below on that question?   Here we have the testimony of six credible witnesses swearing to the positive fact of the existence of undue prejudice, and this is opposed in substance by only the testimony of witnesses who swear that they knew of no prejudice which would deprive the defendant of an impartial trial.   Here is a negative against a positive, involving no conflict.

2. In this case the prisoner was arraigned after the *venire* was drawn, the jury selected and sworn, and the witnesses sworn and put under the rule.   The statute (Rev. Code 1871, sect. 2759) provides that after arraignment the *venire* shall be drawn.   But without this statute we think it would be erroneous to order a *venire* before arraignment.   If a *venire* should not be ordered, a jury could not, we think, be legally empanelled nor the witnesses legally sworn until after issue joined.   Arraignment is the next step after arrest.   Chitty's Cr. Law, 337, 338.   This is the time, as well established by all the common-law authorities on the subject.   The time, form, and incidents of arraignment are clearly defined by the common-law authorities.   That it cannot be dispensed with will not be denied.   See 8 Smed. & M. 595; 2 Hale's P. C. 217, 219; Roscoe's Cr. Ev. 181; 2 Cushm. 611.   On this subject generally, see Chitty's Cr. Law, 337, 338, 345, 451.   If one feature of this part of criminal

pleading can be dispensed with, so .might another, which would lead to a judicial repeal.   The arraignment was not only defective in point of time, but in other respects.   The defendant was not required to plead to the indictment, but was required to plead guilty or not guilty.   When, on arraignment, the defendant stands mute, the court may order the plea of not guilty to be entered for him.   What is " standing mute "?   It is not in refusing to plead guilty or not guilty to the indictment, but in refusing to plead any sort of plea allowed by law to the indictment; and when the accused refuses any sort of plea on arraignment, he stands mute, and then the only plea the court can enter for him is, not guilty.   But here the prisoner objected to arraignment because not made at the proper time.   The objection was overruled, and the defendant was required not simply to plead to the indictment, but to plead guilty or not guilty; and because he refused to plead guilty or not guilty, the court ordered the plea of not guilty entered.   This was not a case of standing mute, wherefore the court erred in ordering the plea of not guilty to be entered.

The observance of every statutory and common-law rule for the protection of the accused is as essential now as formerly. *Ex parte Phillips*, 57 Miss. 365.   See also *Hughes* v. *The State*, 1 Ala. 655 ; 4 Black, 322.

3. The court erred in not permitting the physicians to testify to their opinions of the probable relative positions of the deceased and the accused at the time of the commission of the homicide, as might be indicated by the number, quantity, and character of the blood-stains and blood on the shirt worn by the accused.

Inasmuch as the defendant, a weakly and partially disabled man, proposed to establish in this way that at the fatal moment he was down on his back, and the deceased, a stalwart man, was on him, assaulting him, and pressing him down so that his head and shoulders, by the violence of the assault, were pressed in the earth, and became lower than the other parts of his body, it is of the highest and gravest impor-

tance that the ruling of the court denying to the defendant an opportunity to do so in the manner proposed should be most patiently considered.

It is with diffidence that we venture to lay down the general principle, though we have not the slightest doubt of its correctness, that in all judicial inquiry into doubtful or controverted matters, all means is testimony which may elucidate the truth of the question and which cannot promote error, and that the only objection available against such means as evidence is its relevancy.  This rule covers the means rejected in this case ; and it was admitted that it could not promote error, and was objectionable alone as incompetent, no matter what it would prove.  It was not questioned that the stains on the shirt were blood-stains.  We proposed to prove that some of the spots were round, and how they were made ; that this indicated that the one body was directly over the other, and indicated that the parties were not standing up, and that one was not on horseback and the other on the ground ; also, that some of the marks of blood were oblong ; that the negative character of this was as forcible as the other, and indicated the relative positions of the bodies as clearly as the other ; that the length, shape, and run of some of the marks of blood indicated clearly that some portions of the body were lower than others ; that none of the blood-spots and marks could be reconciled with the positions of the parties standing on the ground, or one on horseback and the other on the ground, and that all were consistent with the position of one on the ground on his back and the other one on top of him ; that the blood did not fall from above, that it was not received by simple contact, and that no theory of the prosecution and no material fact for the State was consistent with the true way that this blood got on the shirt.  Is it not obvious that, from these facts, opinions of medical men (perhaps other educated persons to some extent, too) could be formed possessing moral certainty, and that such opinions could not promote error, and might elucidate the truth of the inquiry, whereas

the exclusion of such opinions might lead to error by a jury of men not presumed in law to be educated, or to be able to read or write, or to understand any of the laws of science, but simply qualified to be jurors by age, citizenship, as householders, and never convicted of any infamous crime, and in a normal mental state? The testimony we offered could not be erroneous. It could not be, and was not objected to on that ground; was not objected to as too remote, or as irrelevant, but simply as incompetent. It was simply said that the opinions we offered could as well be deduced by the jury from the facts as by experts. The soundness and justice of this conclusion and confidence will at once be recognized by every lawyer of experience. How much or how little juries do really know, as a general rule, is so well understood that no verdict creates very violent surprise; and no case, however groundless, is beyond hope, and none, however clear, entirely safe. It is, in truth, the terror of a good cause and the hope of a bad one.

The general subjects on which a medical witness is called on to testify are numerous, — such as homicide, suicide, accidental death, and death by means of violence, drowning, by hanging, and by poisoning; also, rape, pregnancy, delivery, legitimacy, infanticide, insanity, and so on, — and the questions that may be asked in each are as varied as the cases themselves, in connection with all the circumstances surrounding them. In rape, what were the marks of violence on the clothes, on the person, on the organs, on both, and what do they indicate? Dean's Med. Jur. 26, 29, 30. What was the weapon, in case of violence, with which the injury was inflicted, and what does the character of the wound indicate? Ibid. Most people of ordinary intelligence may tell very well a contused, an incised, a punctured or lacerated, or sword or gunshot wound. The effect very plainly indicates the cause; but universally these are proved by experts. The reasoning process is as easy in those cases as in the one at bar, and more so; but the point is, that some are plain and some are not, and hence all belong to the sphere of science. While a jury may

found a verdict on a deduction, yet whenever a deduction is to go to the jury as evidence it must be given by experts, and it may always be so given when the deduction arises or may be shown to arise. Circumstances vary the effect of causes, and the guarded views of men of science are needed to detect and prevent error. Id. 238. Whether, in case of pistol-shot, it was fired near or at a distance, from what direction it came, position of party shot and party shooting. Id. 241, 242, 244. See the case of Dr. Gordon Smith (Id. 244) as indicating the direction, the person firing, and in fact the whole case. Are the wounds self-inflicted, accidental, or the act of another? Id. 246. See the case of Selles, servant of the Duke of Cumberland. Id. 249. I would respectfully ask the attention of the court to the case of Charles Dautun, showing the latitude wisely allowed medical experts, and its vindication in that case. The physician tells what a man will do when struck, where he is likely to be wounded, and how he arrives at the conclusion that two are assaulting, and so on. Id. 251. See the cases of the Earl of Essex and Jane Norkott. Id. 257. In the latter case a knife was found sticking in the floor, point towards the bed. Id. 257. Under the ideas that prevailed in this case, the idea of the knife indicating anything would have been regarded as altogether Utopian. As to the right to prove the relative position of the bodies by this means, see Id. 260, 431. On the same general principle, see Prince de Condé's case (Id. 431, 438) as to marks of violence. We refer generally to the Mississippi authorities on the subject of experts, viz.: *Pitt's Case*, 43 Miss. 472; *Knight v. The State*, 43 Me. 11; *Jones v. Finch*, 8 Geo. 461; *The State v. Clark*, 12 Ired. L. 151; 6 Ala. 212; 69 Pa. 41; *New Orleans, Jackson & Great Northern R. Co. v. Britton*, 9 Geo. 242; *Caleb's Case*, 10 Geo. 72. The spots on the front of the shirt indicate the position of the parties mainly. The large blood-mark in the rear indicates that the shoulders were lower than other parts of the body, the running being in the direction of the larger part of the mark.

4. The motion for a new trial involves the legality and correctness of all the preceding steps in the case. We respectfully submit that the affidavit of Duncan shows that it is probable that the juror McCarty had formed an opinion in the case before he was selected as one of the jury. If so, this vitiates the verdict. Certainly the guard over the jury was loose, and their conduct irregular — too much so to be relied on or allowed in matters of life and death. 3 How. 27 ; Sam's Case, 2 Geo. 480. If the purity of the verdict might have been affected, this is enough. 4 How. 27 ; McCam's Case, 9 Smed. & M. 15 ; Caleb's Case, 10 Geo. 722 ; Bole's Case, 13 Smed. & M. 398 ; Organ's Case, 4 Cushm. 78 ; Hood's Case, 43 Miss. 364.

Houston & Reynolds, on the same side.

1. We contend that, on the showing made, the venue should have been changed.

The twenty-four witnesses state that they do not know whether there is any prejudice or not. Their opinions were not testimony. It was the province of the judge to decide whether a fair and impartial trial could be had. Nine witnesses stated, — six testifying in the affidavit presented for a change, and three orally, — that there was undue prejudice in the public mind, and that it was caused by some official conduct of the defendant as sheriff of Lee County. There is the affirmative proof of the existence of the prejudice in the public mind. Will it be maintained that this was overcome or even weakened by other witnesses, who stated that they had no knowledge of the question — never heard it discussed? Is the negative, the inferential, to overcome the affirmative, the positive? The prejudice in the public mind may have existed without being known to the persons who testified. The existence of the prejudice being established, it was the duty of the court to order a change of venue.

We do not interpret the statute in reference to change of venue in criminal cases as remitting the question of a change to the discretion of the circuit judge. Code 1871, sect. 2762.

The terms, "in his discretion," used in the section, are intended to apply to the county to which the change is made. But if confided to the discretion of the judge, it has been abused in this case.

2. There must be an arraignment of the defendant on an indictment in order that the proceedings of trial may be legal, and, before our recent statute curing the defect, the failure of the record to show the arraignment was error. *Wilson's Case*, 42 Miss. 639; *McQuillan's Case*, 8 Smed. & M. 587. At common law, the arraignment must be made before the jury are sworn. Under our statute, when the charge is a capital crime, the arraignment must precede the drawing of the special *venire*. Code 1871, sect. 2759; *The State* v. *Hughes*, 1 Ala. 655; *Newsom* v. *The State*, 2 Ga. 60. The arraignment in the case at bar was had after the order for the *venire*, and after a jury had been selected and sworn.

When the defendant was arraigned he was not required to plead to the indictment, but was required to plead guilty or not guilty. He had the legal right to plead to the jurisdiction in abatement, or specially in bar. This was denied, and he was subjected to the alternative of a plea of guilty or not guilty. It may be argued that if the defendant had desired to plead specially, he should have presented his plea and asked the court to pass upon it. When the defendant was arraigned, he protested that the time had passed for this proceeding. "Discharge your jury, order a new *venire*, and, at the time of making this order, then demand of me a plea." The court overruled the demand, and required a plea of guilty or not guilty. To this the defendant excepted, and it would have been a contempt of the court to have offered a special plea in disobedience of its order.

3. There was no foundation laid by the testimony for the admission in evidence of the statements made by Helms, the deceased. "It is essential to the admissibility of these declarations, and is a preliminary fact to be proved, * * * that they were made under a sense of impending death. It is

the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. If there was any expectation or hope of recovery, however slight it may have been," they are inadmissible. 1 Greenl. on Ev., sect. 158.

The objection to the admission of these declarations may be briefly stated. At the time they were made there was no evidence of the condition of Helms, or his consciousness of that condition. The witness Lawson does not testify to his condition when the statements were made. He does state his condition previously; but that is not evidence that he was in the same state when the declarations were made. And the condition of mind of the deceased, as declared by Lawson, was not sufficient to warrant the admission in evidence of his dying declarations, because it does not appear that there was no hope of recovery.

4. As to the testimony of Cherry and Woods that they saw blood on the horse which was ridden by the deceased at the time of the difficulty. Where a substance resembling blood is testified to under the circumstances detailed by Cherry, " it cannot be presumed to be blood, but must be proved to be such by actual examination," by chemical tests. " The danger of relying upon mere appearances, unsupported by accompanying circumstances, is obvious." Burrill on Cir. Ev. 136, 137. If the blood or spots had been found on the horse immediately after the occurrence, and traceable to the subject of the crime itself, then the inference that they were blood might have been permitted to have gone to the jury without any chemical test as to the true character of the spots. But the spots testified to by Cherry were discovered ten hours after the crime, after full opportunity for the spots to have been put there by design or accident, and after the horse had been ridden nearly twenty miles. We submit that they were not necessarily traceable to the subject of the crime.

5. The record shows that the jury had the horse that the

deceased was riding on the night he was killed brought up, and they measured him ; and one of them got on him, while another stood on the ground with a knife and experimented. The jury had this done — it was their action. Defendant was not permitted to make his experiments. We submit that the whole proceeding was erroneous.

6. The exclusion of the testimony of the experts as to the probable position of appellant and deceased at the time the blood flowed upon the shirt exhibited to the jury was error. The position of the person wearing the shirt at the time the blood-stains were put upon it, and of the object from which the blood came, was not one of common skill and experience. It related peculiarly to the science of surgery and medicine.

7. The court erred in permitting the State to reopen the case after the testimony for the defendant had closed, and to reintroduce testimony in rebuttal which had been introduced, and by the same witnesses, before defendant's evidence was introduced. The defence set up was that the deceased had assaulted the accused with a piece of railing, and that it was found near the scene of the difficulty, and was known by many citizens to have been lying in the road for several months previous. Before this defence had been disclosed, the State proved by several witnesses that they examined and saw no rail or railing. The defence proved there was a rail or railing, and by several witnesses. The State, over the objection of the defendant, was permitted to prove by the identical witnesses that had testified in the opening of the case that there was no rail. This was contrary to law and precedent.

8. The jury were not properly guarded and shielded from outside influences.

*T. C. Catchings*, Attorney-General, for the State.

1. The application for change of venue was properly refused. It abundantly appears from the statements of the persons called by the State, who resided in various portions of the county, that there was no such prejudice as claimed. Their statement that they knew of no such prejudice, and had not

heard it discussed, is tantamount to a declaration that none such existed.

2. The swearing of the jury and the witnesses was done, as appears by the bill of exceptions, before arraignment and plea. This was certainly irregular, and in one case ( *Hughes* v. *The State*, 1 Ala. 655) it was held to be a fatal defect. But is this true to the extent stated in that case? If objection had been made at the time, and the court had overruled the objection and forced the accused to proceed, it would have been a ground for reversal. But no objection was made by him to the jury as organized, and none to the witnesses. The only objection made was to the arraignment, which was properly disallowed, as the district attorney had the right to arraign him, for in that way only could an issue be made up for the jury. The defendant should have moved to quash the panel if he desired to object·to the jury as organized, or that they be resworn if he wished to object on that score. It must be presumed, therefore, that he waived all objection to the jury because the *venire* had been drawn, and the jury organized and sworn, before arraignment and plea, and that he also waived objection to the swearing of the witnesses at the time they were sworn.

3. There is nothing in the idea that the court compelled the accused to plead guilty or not guilty, thus excluding any other objection or defence he might desire to interpose. His refusal to make any other answer to the indictment than objecting to his arraignment at that time, which was frivolous, amounted to standing mute, and justified the court in entering the plea of not guilty for him. If he had any other defence or answer to make he should have offered it when called on. There is nothing in the bill of exceptions to support the argument that he was prevented from anything but pleading guilty or not guilty.

4. As to the point made upon the dying declarations of the deceased, I refer the court to the testimony. The law on this subject is so well understood that no argument can elucidate

it. The testimony will, I think, be found to establish fully that they were made by deceased under a sense that he was bound to die.

5. The objection to the admission of the statements of witnesses that they found what they supposed to be blood on the horse of the deceased, because it was not shown by chemical examination to be blood, is not supported by the authority cited. The general rule is laid down as contended, but the case before the court comes within the exceptions to it. It was the facts surrounding the circumstance of the spot on the horse which made it competent for the witnesses to express the opinion that it was a blood-spot. Burrill on Cir. Ev. 137.

6. As it is not shown that the defendant objected to the jury examining the horse of the deceased and making experiments, he cannot object here. Indeed, it may be presumed that they made the examination, experiments, etc., by the consent and with the coöperation of all concerned. There is nothing to the contrary in the record.

7. The testimony of the supposed experts was properly excluded. The proposed testimony was but the opinion of the physicians, and that upon a point not requiring special study to reach. In such case, opinion is not admissible as testimony. The jury were equally competent with the experts to draw conclusions from the facts in testimony as to the position of accused and deceased when the blood was put upon his shirt. 2 Whart. & Stille's Med. Jur., pt. 2, sect. 1245. The question asked was not one pertinent to medical science, or any other science. A farmer, or merchant, or lawyer, is as capable of answering such a question as the most distinguished physician or surgeon, and when answered, the jury would be none the wiser, inasmuch as they themselves are quite as capable of answering it as the farmer, merchant, lawyer, physician, or surgeon. In short, as the question is not within the domain of any science, and as, in the language of Wharton & Stille, cited above, it would not require special study of a particular

abstruse science to reach the conclusions given by the witnesses (if they had been allowed to testify), the case does not come within the exception to the rule that opinion is not admissible testimony.   More learned jargon and technical nonsense seem to have been devoted by the courts and law-writers to the discussion of this question of expert testimony than almost any other, but from the chaos of words, ideas, and illustrations Wharton seems to have formulated the doctrine correctly in the passage cited.   Ibid. ; *Caleb* v. *The State*, 10 Geo. 731.   An inspection of the opinion of the court in *The State* v. *Knight*, 43 Me. 133, cited by counsel, will show that it is not in point, and no case has been found by me or cited by opposite counsel which would warrant the introduction as testimony of the opinion of a witness, whether a medical expert or not, upon the point here presented.

8. None of the other points made are deemed of importance, and I shall not therefore discuss them.

CHALMERS, C. J., delivered the opinion of the court.

There was no error in refusing the change of venue.   Six affiants made oath for defendant that such prejudice existed in the county that an impartial trial could not be there had. Twenty-four persons, by-standers in the court-room, from different portions of the county, testified that they knew of no such prejudice, and that in their opinion an impartial trial could be had in the county.   This justified the action of the court.   The special *venire* was drawn, the jury empanelled, the witnesses on both sides sworn and placed under the rule, and the first witness put on the stand and his examination about to be proceeded with, when it was discovered that the minutes of the court did not show any arraignment of, or plea by, the accused.   The defendant being then called upon to plead, declined to do so, and " objected to an arraignment at this time, after the drawing of the special *venire* and the swearing of the jury."   His objection was overruled, and he excepted.   Being then again called upon to plead guilty or not

guilty to the indictment preferred against him, he refused to plead, and, standing mute, the court ordered a plea of not guilty to be entered for him, to which also he excepted. His exception was overruled, and the trial proceeded without further objection on this point. If we could consider the defendant's objections as intended to apply to a trial before the jury then in the box, and as sufficiently advising the court below of that intention, we would be disposed to ignore technicalities as to the form in which they were presented and to consider the objections as they were intended. The empanelling of the jury before arraignment was of course improper, and would have been fatal to the verdict at common law, but whether so under our statutes (Code 1871, sects. 2759–2843) is more doubtful. However this may be, it was certainly the duty of the accused, after the arraignment was had, to object in some way to a trial before the jury already empanelled. But he seems carefully to have abstained from this. All of his objections were to arraignment, and when these were overruled his objections ceased; nor did he thereafter in any manner give the court to understand that he objected to the trial being then proceeded with. If the court below ruled correctly upon all the objections urged before it, certainly the accused cannot claim a reversal because from those submitted another was not by the court inferred which might possibly have been good, but which was never made. That the court below did rule correctly upon the question of arraignment is too plain for argument. Manifestly, the power to arraign was not lost by the precedent, and therefore improper, empanelling of the jury. So to hold would lead to the absurd result that the accused could never be arraigned or tried at all. What steps should follow arraignment was a wholly different question. If he objected to anything thereafter done, or proposed to be done, it was essential under our statute that he should have specifically stated his objections before verdict. The language of the statute is explicit: "No person shall be acquitted or discharged in criminal cases before verdict of a jury, for any

irregularity in the pleadings or proceedings ; nor shall any verdict or judgment be arrested, reversed, or annulled after the same is rendered, for any defect or omission in any jury, either grand or petit, or for any other defect, either of form or of substance, which might have been taken advantage of before verdict and which shall not have been so taken advantage of." Code 1871, sect. 2884.

This section is added to, but not changed, by the act of 1878 (Sess. Acts, p. 200), except to be made more stringent. It is true that it was said in *Newcomb's Case*, 37 Miss. 397, that, notwithstanding this statute, or rather an older and similar one, a defect in an indictment so fatal that no offence was charged might be taken advantage of after verdict, for the obvious reason that, nothing being charged, the conviction was a nullity ; but the question here is of no such character. Except as a matter of the orderly conduct of business and of convenience of trial, an arraignment might as well succeed as precede the empanelling of the jury, and there is no such importance or sanctity about the time when it shall take place as to make a verdict null, despite the statute, where it has taken place at an improper time.

The object of the statute quoted was to defeat what may have been the intention here, namely, to object only to an arraignment, and, this being overruled, to permit the trial to proceed without objection, claiming, of course, an acquittal if the result was favorable, and a reversal if it was not.

There is no force in the point urged that the court below, by calling upon the prisoner to plead "guilty or not guilty," debarred him from pleading in abatement. The arraignment was in the usual form, and there was no suggestion that he desired to plead in abatement.

The dying declarations of the deceased were properly admitted in evidence. He had declared that " he was bound to die " — " could not get well." It is doubtful whether this declaration preceded the statement as to the circumstances of the difficulty as testified to by one of the witnesses, but the

statement as detailed by that witness is similar to that testified to by other witnesses, who clearly show that the declaration as to the certainty of impending death preceded the account given of the difficulty.

It is objected that the testimony of witnesses was improperly admitted to the effect that, ten hours after the difficulty which resulted in the subsequent death of the deceased, they observed spots of blood upon the horse which deceased was riding at the time he received his wounds.

It is said that when a substance resembling blood is testified to as being found near the scene of combat, or upon the body or weapon of one of the combatants, it cannot be presumed to be blood, but must be proved to be such by actual·examination under a chemical analysis; and in support of this proposition the authority of Burrill on Circumstantial Evidence, pp. 136, 137, is cited. We understand Mr. Burrill as declaring that, in a case resting upon circumstantial evidence, proof of apparent blood-spots, without chemical analysis, will not warrant a legal presumption that the substance was blood, because of the similarity of stains that may be left by many other substances, but not as declaring that such proof would be incompetent in the absence of analysis. If this latter is his meaning, we decline to adopt it as a rule of evidence. The number of men in this State who are capable of making a chemical analysis of blood is very limited, and to reject on that account all proof of apparent blood-stains as *indicia* of crime would strike down one of the most potent methods of detecting it.

It is assigned for error that the jury inspected the horse that the deceased was riding on the night of the difficulty, and made experiments with a view of ascertaining whether it was possible for the wounds sustained by him to have been inflicted by a knife in the hands of a person standing on the ground.

If the record showed that this examination of the horse took place out of the presence of the court and in the absence of the prisoner, it would be fatal to the verdict. 3. Whart. Cr. Law (7th ed.), sects. 3160, 3313, 3314; *Benton* v. *The*

*State*, 30 Ark. 328; 24 La. An. 46.   But the record does
not show this.   On the contrary, the very meagre entry on
the subject in the bill of exceptions seems to indicate that
the production of the horse and the test by experiments was a
part of the proof offered by the State.   As it would have been
competent for the court to have permitted this in the presence
of the prisoner, we must presume that it was properly done.

The shirt worn by the prisoner at the time of the combat,
which was covered with spots of blood, was produced on the
trial, and the prisoner proposed to ask various physicians who
were introduced as experts to give their opinions as to the
relative positions of the combatants at the time of the diffi-
culty, as indicated by the blood upon the shirt, with a view, as
was stated, of showing by the blood-marks that the prisoner
was probably prostrate on the ground, and deceased on top of
him, when the stains on the shirt were received.

The court refused to admit the testimony, upon the ground
that it was not a matter of science or of technical skill, but one
of common experience and common sense, as to which the
jury must judge for themselves.

The opinions of witnesses are receivable in evidence in two
classes of cases, to wit: First, where experts in a particular
science or calling are permitted, with or without acquaintance
with the special matter in hand, to state the opinions formed
from such acquaintance or from hypothetical statements of
facts propounded to them; and, second, where persons not
experts are permitted to testify as to the opinions formed by
themselves in regard to the common transactions of life, at the
time of their occurrence, in consequence of things which can-
not be reproduced before the jury.   Under the first head
would come the familiar cases of opinions of men of science
testifying as to the peculiar learning connected therewith, or of
the practical man who details the results of long observation
in the particular calling to which he has devoted himself.
Under the second would fall those instances in which the com-
mon observer is permitted to testify as to the direction from

which a particular sound seemed to come, or as to the apparent size or weight of a stationary object or the speed of a moving one, as to whether a person appeared to be sick or well, or drunk or sober, or sane or insane, as well as countless other instances, more easily imagined than enumerated.

All such things are more or less matters of opinion ; but because the witness has possessed advantages of observation which cannot be enjoyed by or be reproduced before the jury, and because they relate to matters about which a man of average good sense may, without special training, be safely trusted to form a correct opinion, the law permits that opinion to be given in evidence.   But if, as to such matters, the jury can be put in possession of all the facilities for forming a correct opinion that the witness had, they must come to their conclusions unembarrassed by the opinions of others.   In the case at bar, the physicians whom it was proposed to examine as to their opinions relative to the flow of blood upon the shirt saw the garment exactly as it was when produced before the jury, and had no other facility than the jury for arriving at a correct conclusion in regard to it.   Unless, therefore, the inquiry can be regarded as involving some matter of science or technical skill, their opinions were inadmissible in evidence. What is a matter of science and what a matter of common experience is always a question for the court to decide, and we think that the court below committed no error in holding that the inquiry here related to the latter and not to the former.

Experts in the running of railroad trains have not been permitted to give opinions as to whether the time allowed for a passenger to alight from the train was sufficient, nor whether the blowing of a whistle under certain circumstances would have been prudent.   *Keller* v. *Railroad Co.*, 2 Abb. Pr. 480 ; *Hill* v. *Railroad Co.*, 55 Me. 438.

A physician was not allowed, in *Cook* v. *The State*, 24 N. J. L. 843, to give his opinion as to the possibility of a rape having been committed in a particular manner described by a previous witness.

Farmers were not allowed, in *Enright* v. *Railroad Company*, 33 Cal. 230, to give opinions as experts as to the sufficiency of a fence to restrain cattle; nor insurance men and real-estate dealers to testify as to the increased liability to fire in unoccupied buildings.  *Muloy* v. *Insurance Co.*, 2 Gray, 541.  See also, to the same general effect, *Gavish* v. *Pacific R. Co.*, 49 Mo. 274; *Connell* v. *Phœnix Ins. Co.*, 59 Me. 582; *Allen* v. *Stout*, 51 N. Y. 668.

The principle of all these cases is that the inquiries related, not to matters of science or technical skill, but to the common affairs of life, as to which the jury must form their own conclusions from the facts proved.  Certainly the matter in hand in this case seems much more clearly one in the consideration of which the hypothetical conjectures of so-called experts should be excluded than in some of the cases cited above. The case of *The Commonwealth* v. *Sturdivant*, 117 Mass. 122, was much like the one in hand.  There a chemist was permitted to testify as to the probable flow of blood upon a garment, but it was on the ground, not that he was an expert, but because the blood originally on the coat had been in great measure rubbed off before it was produced before the jury, and he was therefore permitted, as any common observer would have been, to state the opinion formed at the time from its original appearance.  This was but an illustration of that class of opinions alluded to above as being receivable in evidence, not as deductions from science, but as the suggestions of common sense and common experience from the observation of things which cannot be reproduced before the jury. No such facts existed in this case.

Three witnesses for the State, on reëxamination, were allowed, against the objections of the prisoner, to repeat, in contradiction of testimony which had been given for him, certain statements which they had made in their examination in chief.  It is urged that they should have been restricted to matter in rebuttal of the proof made by the accused, and

should not have been allowed to repeat what they had already testified to in chief.

Undoubtedly the general rule is as stated, and the reintroduction of witnesses for the mere purpose of repeating their testimony should not be allowed; but such matters rest largely in the discretion of the court, and will not, ordinarily, afford ground of reversal. We cannot see that any injustice was done by it in this case.

No improper conduct on the part of the jury during their retirement was shown.

Judgment affirmed.