## BROWN *v.* STATE.

Decided March 19, 1892.

| 55 | 593 |
|----|-----|
| 55 | 605 |
| 55 | 593 |
| 56 | 617 |
| 55 | 593 |
| 62 | 74 |
| 55 | 593 |
| 69 | 150 |
| 55 | 593 |
| 72 | 439 |
| 55 | 593 |
| 79 | 601 |
| 80 | 89 |
| 80 | 92 |
| 82 | 597 |

1. *Expert testimony—Matter of common knowledge.*

    In a murder case the opinion of a medical expert is inadmissible to show the position of deceased at the time a wound was received or the position of the person who inflicted it.

2. *Homicide—Justification—Defense of habitation.*

    Under section 1551, Mansf. Dig., which provides that "a manifest attempt and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein, shall be a justification of homicide," a homicide is justifiable where deceased had armed himself with an axe and in a violent, threatening manner attempted to enter the house where defendant was, and defendant reasonably believed that deceased intended to kill him or do him great bodily injury and killed him to defeat such purpose, if defendant reasonably believed such homicide was necessary to prevent deceased from entering the house.

3. *Indictment—Accessories—Instruction.*

    In the trial of one indicted as principal in a homicide it is error to give in charge to the jury section 1505 of Mansf. Dig., relating to accessories.

4. *Evidence—Uncommunicated threats.*

    In a trial for homicide where it is a material question whether the prisoner or the deceased was the aggressor, it is competent to prove threats of violence against the prisoner made by the deceased a few days before the killing, though not brought to the knowledge of the prisoner.

APPEAL from *Pope* Circuit Court.

H. S. CARTER, Special Judge.

Brown and King were jointly indicted for the murder of J. N. Jones. They severed at the trial, and Brown was convicted of murder in the second degree. By appeal he questions the action of the court in giving certain instructions, in refusing certain other instructions, in admitting certain expert evidence and in refusing to admit evidence of uncommunicated threats made by deceased. The circumstances of the homicide are sufficiently stated in the opinion.

The defendant offered to prove by Mrs. Medlin that a few days before the killing she heard deceased say that he and defendant had not made friends, and that their trouble

S C—38

would never be settled except at the end of his double-barreled shotgun ; and by several other witnesses that they had heard deceased at different times threaten the life of defendant. It was not shown that Mrs. Medlin had communicated the threat to defendant. The testimony was rejected.

Defendant asked the court to charge the jury as follows :

1. " If the jury believe from the evidence that Tom Brown was in the house of Mrs. Ratliff, and that the deceased came and entered into the yard and picked up an axe and undertook to enter the house with the said axe, with the intent to kill the said Brown and killed the deceased, they will find him not guilty.

2. " If the jury believe from the evidence that defendant, Tom Brown, was in the house of Mrs. Ratliff, and that he was advised that deceased had threatened his life, and in good faith believed as a reasonable man that deceased intended to kill him or do him great bodily injury, and whilst so in the house of Mrs. Ratliff, deceased came there mad and entered into the yard and in a violent, threatening manner picked up an axe, and with said axe drawn in a menacing and threatening manner undertook to enter the house where defendant was, and that defendant believed as a reasonable man that deceased intended to kill him, or do him great bodily injury, and acting under the influence of said belief, whilst deceased was so endeavoring to enter the house, defendant killed him, deceased, the killing would be justifiable.

4. " The fact that deceased may have made violent threats against defendant, or that the character of deceased was that of a dangerous and violent man, and the defendant a peaceable man, would not justify defendant in taking deceased's life ; but these are circumstances admissible to be considered by the jury together with all other facts and circumstances in proof in the whole case determining who was the probable aggressor in the difficulty, and in determining whether there was any real or reasonably apparent necessity

for the defendant to take the life of the deceased in order to save his own or prevent great bodily injury."

The court modified the second instruction by striking out all after the words " undertook to enter the house where defendant was," and adding " that defendant might use such force as was necessary to repel the assault, and, if necessary to save his own life or prevent great bodily injury, he might slay the deceased. And if the defendant, as a reasonable man, believed that the deceased intended to kill him, or do him great bodily injury, and acting under the influence of such belief, whilst the deceased was so endeavoring to enter the house, and that the danger was so urgent and pressing that in order to save his own life or prevent his receiving great bodily injury, the defendant killed him, then the killing would be justifiable."

The court, having modified instruction number two asked by defendant and numbered it one, then gave, on its own motion, number two, as follows :

2. " You are instructed that previous threats or acts of hostility towards the defendant, however violent they may have been, were not, of themselves, sufficient to justify the defendant in killing the deceased. To excuse him, or justify him, he must have acted under an honest belief that it was necessary at the time of the killing to take the life of the deceased, Jones, in order to save his own life. And it must appear that there was reasonable cause to excite this apprehension on his part ; so that if you find that the deceased, at the time he was killed, did nothing to excite in the mind of the defendant that the deceased was about to execute said threats, then the threats and bad character of the deceased, whatever you find them to have been, are unavailing, and should not be considered by you. But if the evidence leave you in doubt as to what the acts of the deceased were at the time or immediately before he was killed, you may consider the threats and character of the deceased, and character of the defendant for peace or violence, in connection with all the other evidence in the case, in determining who

was probably the aggressor. The jury are instructed that no mere threats made by deceased before or at the time of the killing, unaccompanied at the time of the killing with any attempt to carry the same into execution, are sufficient. to justify the killing or reduce it to a lower degree of homicide than murder. And if you believe that defendant shot and killed the deceased on account of said threat, and at the time he shot him he was in no fear of immediate danger, he is guilty of murder; and if the killing was the result of deliberate purpose fixed in his mind to kill, it was murder in the first degree."

The court also gave in charge to the jury sections 1505, 1516–1522, 1530–1533, 1547–8, 1551–1553 of Mansfield's. Digest.

*R. C. Bullock* for appellant.

1. There is no testimony whatever in the entire record,. except the expert testimony which was inadmissible, but what shows defendant to have been justifiable in the killing. Defendant was in his castle, and had the right to resist with force any unauthorized entry. Mansf. Dig., sec. 1551; Whart.,. Cr. Law, sec. 505.

2. Dr. Ruff's testimony as to the position of deceased was not admissible. Whart., Cr. Ev., sec. 418; 17 S. W.. Rep., 1073; 39 N. Y., 245; 41 Me., 177; 66 Am. Dec., 219;. 19 Wend., 569; 1 Denio, 281; 24 Ark., 251.

3. It was error to admit Jeff Worthen's testimony and exclude Mrs. Medlin's.

4. The first instruction should have been given. 1 Whart.,. Cr. Law (9th ed.), 505. The second instruction was a correct definition of the law, and the court erred in modifying it. Mansf. Dig., sec. 1553.

5. The third instruction is in line with 51 Ark., 553.

*W. E. Atkinson*, Attorney General, and *Chas. T. Coleman* for appellee.

1. As to the admissibility of the expert testimony of Drs.. Ruff and Kirkscey, see 68 N. C., 443; 3 Brewst., 249.

2. It was not shown that the threats were communicated to Brown. Bish., Cr. Pro., secs. 610–11, 621, 617.

MANSFIELD, J. The defendant sought an acquittal of the charge against him, on the ground that the homicide was justifiable. The theory of the prosecution appears to have been that the killing was an assassination. It occurred at the dwelling house of Mrs. Martha Ratliff. She was the mother-in-law of Brown, and he and his wife were there as her guests. He had come into the neighborhood at the request of Mrs. Ratliff for the purpose of removing her and her family to the place of his own residence in the county of Searcy. The deceased resided near her house, and she had been in his employment for ten or twelve years. He had controlled her labor and that of her children during that time, and he objected to the proposed removal. He was displeased at the marriage of the defendant to Mrs. Ratliff's daughter, which took place in the year preceding that of his death, and it was proved that he had frequently threatened to take defendant's life. The latter had been informed of many of these threats, and it was shown that the reputation of the deceased was that of a revengful and dangerous man. Two witnesses testified that on the day he was killed he declared that he would kill Brown if the latter attempted to effect the removal which Mrs. Ratliff desired to make. Her house contained but one room and had only one door-way. The door opened on to a porch which was four feet wide with its floor twenty inches above the ground. There was evidence tending to show that the deceased was killed by a shot fired from the house through the open door as he was advancing toward the door with an axe drawn in a threatening manner and apparently for the purpose of assaulting Brown. He fell with his head from the porch and with one foot on or against the first step leading to the porch floor. Dr. Ruff was a witness for the State and testified as a medical expert. He had examined the body of the deceased and described the wounds found upon it. One of these was on the left side of the

1. Expert testimony as to matter of common knowledge inadmissible.

head and was made with a large-bored gun. He stated that the brains had passed from the skull through the opening made by this wound, to such an extent that he could not by probing ascertain the course of the ball; but on separating the head from the body he discovered "the track of the bullet where it had cut its way down the marrow of the neck bone." He was then permitted to give his opinion, as a physician "and from viewing the premises" where the killing was done, "that it would have been impossible for the deceased to have been shot" as he was "if he had been advancing on the defendant with a drawn axe in any sort of a fighting position whatever." He was also permitted to testify that in his opinion the deceased was shot while he was sitting "on the porch in a reclining position" and that it was not likely that he was killed "in a sudden rencounter." He was also allowed to state his reasons for entertaining these opinions. His testimony, except in so far as it related to the nature of the wounds and the weapons with which they were produced, was objected to by the defendant, and its admission was made one of the grounds of his motion for a new trial.

The opinion of an expert is not admissible to prove a matter of common experience and knowledge, upon which any person of ordinary intelligence is capable of arriving at a correct conclusion. 1 Wharton, Ev., sec. 436; *Milwaukee, etc., R. Co.* v. *Kellogg*, 94 U. S., 469; 66 Am. Dec., 228 (note). The testimony of medical experts forms no exception to this rule; and a physician or surgeon testifying as such cannot therefore give his opinion on a question which the jury are capable of answering without the aid of professional skill and experience. *Cook* v. *State*, 24 N. J. L., 843. He may testify whether in his opinion a particular wound examined by himself or described to him in the statement of a hypothetical case was the cause of death or was sufficient to produce death. *Ebos* v. *State*, 34 Ark., 520. He may also give his opinion as to the nature of the instrument which produced a particular wound, the force re-

quired to produce it, and whether a given injury could
have been inflicted by a weapon of a particular de-
scription. Having examined a wound a physician may state
its direction upon the body; and if its appearance cannot
be perfectly described to the jury and is such as to indicate
the direction from which it was received, he may state his
opinion as to such direction. *Fort* v. *State*, 52 Ark., 180.
But his opinion is never admissible to show the position of
the body at the time a wound was received nor the position
of the person who inflicted it. The adjudged cases to this
effect are numerous; but a reference to only a few of them
will serve to illustrate the view which the courts have taken
of this question. In the case of *Kennedy* v. *People*, 39 N.
Y., 245, the trial court permitted a physician to testify that
in his opinion the deceased was probably sitting in a stooped
position with his head upon his hands when he received a
blow on the side of his head; and that he was "probably
lying down, either on his back or face," when a wound on
the top of his head was inflicted. This testimony was held
to be incompetent—the Court of Appeals saying that it
should have been left to the jury to infer the position of the
body from the facts which tended to show it. In *Cooper* v.
*State,* 23 Texas, 331, the deceased was upon his horse at
the time he was killed. And it was held that the opinions
of physicians who examined his body were not admissible
to show that the person who shot him was also on horse-
back or fired from some other elevation. The court said
the question was one upon which medical experts were not
more competent than the jury to form a correct opinion.
So in *Williams* v. *State*, 17 S. W. Rep., 1072, it was held
error to permit a physician who examined the wound of the
person assaulted to testify that in his opinion the body was in
an upright position at the time the bullet entered it. See also
*Thompson* v. *State*, 17 S. W. Rep., 448; *Hunt* v. *State*, 9
Texas App., 166; *Steagald* v. *State*, 24 Texas App., 207;
*Dillard* v. *State*, 58 Miss., 368; *State* v. *Rainsbarger*, 74
Iowa, 196; *Davis* v. *State*, 38 Md., 15; 66 Am. Dec., 234–235;

Rogers, Exp. Test., secs. 8, 53 ; 1 Bishop, Cr. Pro., sec. 1177 ; Kerr's Law of Homicide, sec. 479. The opinions of Dr. Ruff objected to by the defendant related directly to the merits of the case and not to any question of science or professional skill. They were therefore incompetent, and the court erred in admitting them. 1 Greenl. Ev., sec. 440.

2. When homicide justifiable.    The defendant contends that the killing was justifiable under section 1551 of the digest, which is as follows : "A manifest attempt and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another, for the purpose of assaulting or offering personal violence to any person dwelling or being therein, shall be a justification of homicide." A preceding section of the same statute re-asserts an ancient maxim of the common law by declaring that "every man's house or place of residence shall be deemed and adjudged, in law, his castle." An assault upon a man's house was by the common law an assault upon himself. He could therefore repel such an assault by the force necessary to defeat it. And if, in resisting a forcible attempt to break into his habitation, the life of the assailant was taken when he might have been otherwise resisted, the killing was ordinarily held to be a crime of no higher grade than manslaughter. Cook's Case, Croke's Car., 537; Mead's Case, 1 Lew., 184. So too a man assailed in his own house was not required, as in some other cases, to seek his safety in flight before he could excuse the killing of his assailant as an act of self-defense. 1 Russell, Crimes, 662 ; 1 Whart., Cr. Law, secs. 502, 503; *Carroll* v. *State*, 23 Ala., 28.

The provision of our criminal code embraced in section 1551 is doubtless an outgrowth of the doctrine on which these rules were founded. The right, however, to use such force as is necessary to prevent a mere intrusion into a dwelling house exists independently of that section of the statute. And the attempt to effect such intrusion may be resisted, without regard to the intent with which it is made or the manner of making it. But section 1551 applies only where the attempt is made in the manner and for the pur-

pose which it mentions. And even where the attempt is
thus made, a homicide committed in resisting it will not be
excused if done unnecessarily. (Mansf. Dig., sec. 1526).
To make such a homicide justifiable when committed as a
means of self defense, it must reasonably appear to the
person committing it that the entry of his assailant into the
house will expose him to the danger of losing his life or of
receiving a great bodily injury. And it is his duty to pre-
vent the entry by means not fatal if he can do so consistently
with his own safety. *Pond* v. *People*, 8 Mich., 177 ; *Carroll*
v. *State*, 23 Ala., 28 ; *State* v. *Patterson*, 45 Vt., 308. Fol-
lowing the doctrine of the common law, the statute regards
the violent attempt to enter the house as equivalent to an
assault upon the person to be injured; and when it is ob-
viously about to be made, he may at once put himself in an
attitude to repel the aggressor. It was not practicable to
give a rule applicable to all cases for determining what acts
or conduct will constitute the actual attempt to enter a
house. But it must be a " manifest " attempt; and we take
this to mean one so plainly made that no reasonable doubt
will exist as to the purpose of the aggressor. At what point
the effort to enter the house has begun, and how far it may
be permitted to proceed with safety to the life or person of
the individual assailed, must be determined by the circum-
stances of each case. And these are questions more of
fact than of law.

Brown had the same right of defense in Mrs. Ratliff's
house that he would have had in his own. Whether the de-
ceased was attempting to enter it and in what manner and
for what purpose, and whether at the time he was killed the
life of Brown was imperilled or his person exposed to the
danger of great harm, were all questions for the jury under
proper instructions as to the law. The several sections of
the digest defining justifiable homicide are parts of the same
statute, and so close is their relation that each to some ex-
tent explains or controls the meaning of the other. It was
proper to give them all in charge to the jury, together with

the sections defining murder and voluntary manslaughter. The defendant was also entitled to an instruction making a practical application of the law to the facts which the evidence on his part tended to establish.   As a charge for that purpose his second request would not have been more favorable to his theory of the case than it was proper to give if, after its recital of facts, it had concluded by saying that the killing was justifiable if the defendant reasonably believed it was necessary to prevent the deceased from entering the house.   But the modification made by the court obscured the meaning of the charge and rendered it inappropriate to the defense on which it was requested.

By the first clause of the court's second instruction the jury were told that to justify the defendant in killing the deceased " he must have acted under an honest belief that it was necessary at the time of the killing to take the life of the deceased in order to save his own life ; " and it is not stated in any part of that instruction that the homicide was also justifiable if it was committed in necessary self-defense and to prevent a great bodily injury.   This omission did not occur in the first instruction, and we presume it escaped the presiding judge's notice.   But it made the instruction incomplete as a separate and distinct declaration of the law.   And it appears from the bill of exceptions that the prosecuting attorney in his argument to the jury insisted that under the charge they had received the defendant could not justify the killing if he could have saved his life by flight.   The use thus made of the instruction is assigned as a ground of the motion for a new trial.   But it is shown that the attention of the court was not directed to it at the time the argument was made.   If attention was called to the error at any time before the verdict was rendered, it was the duty of the court to correct it.

There was no error in refusing the defendant's first instruction.   The fourth instruction he requested was a correct statement of the law on the subject to which it relates and was improperly refused.   But the points it embraced were

perhaps substantially covered by a clause in the court's second instruction.

The defendant having been indicted as a principal, section 1505 of the digest relating to accessories had no application to the case. *Williams* v. *State*, 41 Ark., 173; S. C., 42 Ark., 380. And we find nothing in the record to make the act of King in striking the body of the deceased, in the manner testified to by James Jones, admissible in evidence against Brown.

*3. Instruction as to accessories improper when.*

The declaration of the deceased which the defendant offered to prove by Mrs. Medlin was in the nature of a threat made by the deceased a few days before his death, and was competent evidence. In connection with the other threats admitted by the court the declaration referred to was a circumstance proper to be considered by the jury as tending to show that the deceased was the aggressor. Whart., Cr. Ev., sec. 775; *Wiggins* v. *People*, 93 U. S., 465; see also *Harris* v. *State*, 34 Ark., 473; *Sneed* v. *State*, 47 Ark., 187.

*4. When evidence of uncommunicated threats admissible.*

It does not certainly appear from the record whether the other threats excluded were sufficiently recent to make them also admissible. See 2 Bish., Cr. Pro., sec. 621.

The admission of Dr. Kirkscey's testimony mentioned in the brief of counsel was not complained of in the application for a new trial.

It is not important to consider the other questions presented by the defendant's exceptions.

For the errors pointed out the judgment is reversed, and the cause is remanded for a new trial.