Fred M. Pickens, Fred M. Pickens, Jr., and Chas. F. Cole, for appellant.

Guy E. Williams, Attorney General, and Oscar E. Ellis, Assistant Attorney General, for appellee.

HOLT, J. Appellant was convicted of murder in the second degree and his punishment assessed at ten years in the State Penitentiary. The information charged that appellant murdered "Ralph Hedden by beating and kicking the said Ralph Hedden with his fists and feet," etc. From the judgment is this appeal.

The motion for a new trial contains twelve assignments of alleged errors. We consider them in the order presented.

1, 2, 3, 5, 6, 10 & 12

Assignments 1, 2, 3, 5, 6, 10 and 12, in effect, challenge the sufficiency of the evidence.

At about one p. m. on Sunday, September 7, 1947, appellant, Shelby Everett, and seven or eight others, including Ralph Hedden, the victim of his assault, engaged in a game of dice or "shooting craps," as it is commonly called, in Sherrill's pasture near Mountain Gap, Independence county. During the progress of the game, a dispute arose between appellant and Hedden over a dollar wager and a fight resulted between them. Both parties had been drinking liquor and neither was armed.

An eyewitness, Henry Rowens, gave the following version of the encounter: "When Hedden came up they quit poker playing and split up there and one bunch went one way and the other bunch they had a little crap game there and Shelby Everett was shooting and Hedden had him faded; and the dispute, it seems like, was over a borrowed dollar; . . . and then Shelby made his point and he told him he owed him a dollar and Hedden said he didn't have a dollar called or something like that; and Shelby just hit him and he just laid over and he kind of stamped him a little. . . . Mr. Hedden fell back and so he kicked at him a few times; and Hedden said he didn't want any trouble; and I said to Widney Everett: 'Don't let him stamp him up,' or something like that. I asked him to pull Shelby off and not let him stamp the man there; that he wasn't trying to fight . . . He had just fallen over on the cushion there and so he pulled him back and this fellow Hedden got up and ran a ways, and they both ran and Shelby caught him out there. . . . A. All he (Hedden) did was to throw his hand up over his head as he was lying there."

Dee Smart, who was present, testified: "A. Shelby just got up and crossed the table and hit him; and they got him off of him. Q. Did he knock him down? A. Yes, he just fell back there. Q. You say they got him off of him, did he do anything besides hit him? A. Well, he kicked him once. . . . Q. Who pulled him off of him? A. William Young and Fayette Everett. I believe it was.

Q. After they pulled him off, what happened? A. Well, the fellow (Hedden) got up and he ran. . . . A. Well, Shelby (appellant) caught him out there in the field and I wouldn't be sure whether he hit him or not, but he just fell, that is all I know of it. . . . Q. When he kicked at him, in what position was Mr. Hedden? A. He was lying forward. Q. On the ground? A. Yes, sir. Q. Who pulled him away that second time? A. I think it was Wid and William Young.''

Hayden Sanders testified that as he was passing by on his horse he saw appellant running after Mr. Hedden, and quoting from his testimony: ''I rode up to the opening and I saw Shelby running after Mr. Hedden and I heard Mr. Hedden say: 'Catch him, boys, don't let him hit me.' And then he said: 'Stop, stop.' So Shelby ran on and hit him and ran on by him four or five steps and he kicked at him as he ran by him; and then he turned back on him and stamped him. Q. And did you see Shelby Everett hit Mr. Hedden? A. I certainly did. Q. Did he knock him down? A. Yes, sir.''

Dr. John Adametz testified that he was a resident physician at the Baptist Hospital in Little Rock and had occasion to examine Mr. Ralph Hedden who was brought to the hospital following appellant's assault on Hedden: ''Q. What did you find, sir? A. I found that he had a skull fracture in the base of his skull. Q. Where was that? A. On the left-hand side in the back of his head. Q. Did you diagnose any further complications? A. Yes, we diagnosed by means of a spinal tap, we knew that he had blood in the spinal fluid and had some hemorrhage inside of the skull. Q. You mean you took some fluid from the spinal cord? A. Yes, from the spinal canal. Q. Was it cloudy? A. It was cloudy, sir, and pinkish red, indicating that there was relatively fresh blood in it. . . . A. He talked irrationally. Was not able to answer any of my questions coherently. He was neither orientated as to time nor as to place. . . . A. Yes, he (Hedden) died while at the hospital. Q. What was the cause of his death, if you know? A. The man died from cerebral hemorrhage or bleeding within the brain, to the

best of my knowledge. Q. In your opinion, Doctor, what would cause such a hemorrhage of that type? . . . A. In my opinion, in this particular case, we had X-rays of that skull of this patient and he definitely had a linear fracture on the left back part of his head; and it is my opinion that the hemorrhage was a result of this fracture. Q. You speak of this bleeding or cerebral hemorrhage, was it at one place in his head or two places? A. Prior to the autopsy I would not be able to answer that question, but at the time of the autopsy there was bleeding from more than one place, but I prefer that the pathology department discuss that one part of the case. Q. Then, in your opinion Ralph Hedden died as a result of a cerebral hemorrhage secondary to his head injury? A. That is correct.''

Dr. W. R. Lee testified: ''Q. I will ask you whether or not you did an autopsy with Dr. Adametz on the body of Ralph Hedden? A. That is right. Q. Doctor, judging from your findings there in making that autopsy, in your opinion, what caused the death of Ralph Hedden? A. It was our opinion that he died as a result of a skull fracture which in turn caused a hemorrhage into the brain. Q. Will you state, Doctor, just what you found relating to that brain injury or injuries? A. Yes. In the right area, frontal area of the brain, in this area all in here we found a mass of hemorrhage. There was a mass of hemorrhage —now this area of hemorrhage in the front part of the brain here was under the covering of the brain which we call dura-frontal. We also found in the back part of the brain, we found another area of hemorrhage which was above the dura. There was also a skull fracture in this region back here (indicating the left back part of the head). Q. Both these bleedings were causing a pressure on the brain? A. That is right. Q. As a result of that pressure, it caused him to die what kind of death? A. It was pulmonary; it was respiratory type of death. He had a pressure on the brain and the cord itself was blocked both ways from the brain to the lungs causing the lungs not to function. Q. In your opinion, could this injury up here have occurred from a blow back here? (indicating on back of the head). A. It was our opinion

that it did occur from the blow in the rear or back of the head. . . . Q. And it was as a result of this injury that he had to his head and to his brain that he died, in your opinion? A. Yes, sir."

Dr. Anderson Nettleship gave corroborative testimony and in addition testified: "A. Well, any force which would hit the brain, or hit the skull with a force sufficient to produce a jar or bouncing of the brain inside of the skull would produce the damage. We concluded the damage in this instance was recent. . . . Q. Doctor, is it possible to have a concussion of the brain without a skull fracture? A. Yes, very definitely so. . . . A. The immediate cause of death was edema of the brain, or pressure on the brain from the injuries to the back part of the head, caused this man to get in a pulmonary phase of shock from which it was impossible for him to recover. Q. What would an injury of that type be secondary to? A. It would be secondary to some force hitting the skull, or some blow upon the head; you can call it anything you want to, but it is some force hitting the skull."

Appellant, Everett, testified in his own behalf. He admitted he struck the deceased, Hedden, two licks, but denied that he kicked him or hit him in the back of the head.

We do not attempt to detail all of the evidence. It suffices to say that after considering it all, and when we give to it, as we must, its strongest probative force in favor of the State, the testimony was ample to warrant the jury's verdict of murder in the second degree. The evidence shows that as a direct result of the beating, kicking and stamping by appellant, of his victim, Hedden died four days later. Appellant was the aggressor from the beginning.

Appellant argues that "there is nothing in the proof offered by the State to indicate any intent to take life, a necessary element of murder in any degree." The rule is well settled in this State that "actual intent to take life is not a necessary element in the crime of murder in the second degree," *Brassfield* v. *State*, 55 Ark. 556, 18 S. W. 1040 (headnote 4).

In *Ballentine* v. *State,* 198 Ark. 1037, 132 S. W. 2d 384, we said: ''We have many times held that actual intent to take life is not a necessary element of the crime of murder in the second degree. *Brassfield* v. *State,* 55 Ark. 556, 18 S. W. 1040; *Byrd* v. *State,* 76 Ark. 286, 88 S. W. 974. Malice, however, is a necessary element of murder, either in the first or second degree, and it must be either express or implied. Section 2967 provides: 'Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing manifest an abandoned and wicked disposition.' ''

## 4

In his fourth assignment, appellant says that ''the Court erred in permitting the witness, Dr. John H. Adametz, over the objections and exceptions of the defendant at the time to testify in answer to the question as to what caused the hemorrhage of the type he had testified to as being found after the autopsy of the deceased, as follows: 'In my opinion, in this particular case we had X-rays of the skull of the patient and he definitely had a linear fracture on the left back part of his head—and it is my opinion that the hemorrhage was a result of this fracture.' ''

There was no error in admitting this testimony. In one of our earlier cases, *Ebos* v. *The State,* 34 Ark. 520, Dr. Barry, a qualified physician and surgeon, testified that he made a post-mortem examination on the body of Mary Ebos; ''that he found upon the right side of her head, just above the temple bone, a severe contused wound, about six inches in length, and from about one and a half to two and a half inches in width, to the skull. That the skull was not fractured, and he discovered no injury to it. . . . The attorney for the State then asked the witness his opinion as to the cause of the death of the deceased. . . . Witness then testified, in answer to the question, that such a wound as that upon the head of deceased might produce death, and frequently did, and that in his opinion, said wound did cause the death of the deceased by concussion of the brain.''

This testimony was held to be properly admitted. See, also, *Brown* v. *State*, 55 Ark. 593, 18 S. W. 1051.

### 7, 8, 9

Appellant in his seventh assignment alleges that ''the Court erred in refusing to permit the jury to consider the testimony of Widney Everett, a witness for and a brother to the defendant, wherein he stated that he went to the deceased where he was lying and says 'Ralph, do you want me to take you home?' And he says, 'No, I am just a little sick or drunk and I will be all right in a few minutes and that is when I left','' it being contended by appellant that this testimony was a part of the *res gestae.* The court properly directed the jury not to consider this testimony, as part of the *res gestae,* since it was undisputed that these words were spoken by Ralph Hedden after (fifteen minutes or more) the termination of the fight.

The court in *Johnson* v. *State,* 179 Ark. 274, 15 S. W. 2d 405, announced the rule on the admissibility of such testimony as follows: ''Any act or declaration which is done or said after the fight was over is not a part of the *res gestae* and not admissible as a part of the transaction. *State* v. *Ramsey,* 48 La. Ann. 1407, 20 Sou. 904; *Spivey and Lynch* v. *State,* 114 Ark. 367, 160 S. W. 949.''

Further objections of appellant to certain comments of the trial court before the jury on the testimony of Widney Everett were made. In this connection, it suffices to say that we have carefully examined these objections and find them to be without merit.

### 11

Finally, appellant argues that error was committed by the court's refusal to give his offered instruction No. ''A.'' The first sentence of this instruction contains this statement: ''You are instructed that the evidence against the defendant is largely if not entirely circumstantial.'' The court properly refused to give this instruction for the reason that the prosecution here was based on direct, and not on circumstantial, testimony. The instruction

was abstract in effect, inherently wrong and was properly refused.

Appellant made no objections to any of the instructions given by the court, which fairly and fully declared the law applicable to the facts in a case of this nature.

On the whole case, finding no error, the judgment is affirmed.

Opinion delivered May 10, 1948.