## CASEY v. THE STATE.

1. CRIMINAL PRACTICE: *Discretion of Court in rejecting juror.*
   It is the province of the Circuit Court, in the exercise of a sound discretion, to determine the qualification of a juror challenged for bias, and this Court will not say that the discretion is abused by admitting a juror who says, upon examination, that he has formed an opinion of the guilt or innocence of the accused, upon rumor, that will require evidence to remove, but that he has no bias or prejudice against him, and can try the case impartially and without prejudice to his rights.

2. WITNESS: *Accomplice.*
   An accomplice who is not indicted, or is separately indicted, is a competent witness, though convicted, if he has not been sentenced.

3. SAME: *Evidence; Advice of counsel.*
   A witness cannot be compelled to disclose in his testimony the advice or communications of his counsel.

4. EVIDENCE: *Declarations of accomplice.*
   The declarations of an alleged accomplice, in the absence of the defendant, are not admissible against him until other evidence than that of the principal is produced, implicating the declarant in the offense.

5. WITNESS: *Wife of co-defendant incompetent.*
   In this State the wife of one who is jointly indicted with the defendant on trial, is not a competent witness for him.

6. EVIDENCE: *Declarations of accomplice.*
   The declarations of an accomplice are admissible against, but not for, his accomplice on trial.

7. WITNESS: *Contradiction in immaterial matter.*
   The contradiction of a witness in an immaterial matter—that is, one not tending to connect the prisoner with the crime—is material as affecting the credit of the witness with the jury.

8. INSTRUCTIONS: *Repeating.*
   There is no error in refusing to repeat for one party instructions already substantially given for the other.

9. PRACTICE: *Retiring jury during argument of instructions.*
   Requiring the jury to retire during the argument of instructions is a matter of practice within the discretion of the Court, and is not objectionable.

APPEAL from *Franklin* Circuit Court.

Hon. W D. JACOWAY, Circuit Judge.

STATEMENT.

On the seventeenth day of February, 1880, James P. Holland and William Casey were indicted in the Circuit Court of the Dardanelle District, in Yell county, as accessories to Charles G. Helphrey, in the murder of Burgess James. The indictment is as follows:

"The grand jury of Yell county, in and for the Dardanelle District, in the name and by the authority of the State of Arkansas, accuse James P. Holland and William Casey of the crime of murder in the first degree ; committed as follows, viz : That on the twenty-second day of September, 1879, in the county of Yell, in the Dardanelle District, in the State of Arkansas, one Charles G. Helphrey unlawfully, willfully, feloniously, deliberately, of his malice aforethought, and with premeditation, did kill and murder one Burgess James, then and there living, by then and there shooting him, the said Burgess James, with a certain pistol, which he, the said Charles G. Helphrey, then and there held ; the same being loaded with gunpowder and leaden bullets ; and by then and there striking him, the said Burgess James, with the pistol aforesaid, so held by the said Charles G. Helphrey as aforesaid, with feloneous intent, him, the said Burgess James, then and there to kill and murder, against the peace and dignity of the State of Arkansas.

"And the grand jury aforesaid in the name and by the authority aforesaid, upon their oaths, do further present that the said James P. Holland and William Casey, before the said felony and murder was committed as aforesaid, to-wit: on the twenty-first day of September, 1879, in the district, county, and State aforesaid, did unlawfully, feloniously, deliberately, of their malice aforethought, and with premeditation, incite, move, procure, counsel, aid, hire and command the said Charles G. Helphrey to do and commit

the felony and murder, in manner and form aforesaid, against the peace and dignity of the State of Arkansas.''

The defendants obtained a change of venue to the Circuit Court of Franklin county, and there filed a demurrer for uncertainty and insufficiency of the indictment. The demurrer was overruled, and they severed, and Casey was tried and convicted of murder in the first degree.

In empanelling the jury, James Huggins, offered as a juror, upon examination, stated that he was not acquainted with the parties, but had frequently heard, on several occasions, at the Circuit Court in Yell county, what purported to be the particulars of the case. He did not know whether it was the witnesses in the case or not that told him of them, but what he heard made such an impression on his mind as to the guilt or innocence of the defendant as would require evidence to remove it. He further stated that the opinion he had formed was such that he could go into the jury box and decide the case as impartially as if he had heard nothing about it, and without prejudice to the substantial rights of the defendant; that he had no prejudice or bias for or against him. The defendant challenged him for cause. It was overruled and he excepted.

Three others, offered as jurors, stated upon examination, that they had formed opinions, from rumor, of the guilt of the defendant, which would require evidence to remove; but that they could go into the jury box and try the case as impartially as if they had heard nothing, and without prejudice to the defendant's rights; and they had no bias or prejudice for or against him. A challenge to them for cause was likewise overruled, and the defendant excepted. The bill of exceptions does not show whether these four were put upon the jury or not.

Upon the trial the principal, Charles G. Helphrey, was offered as a witness by the State. The defendant objected

to his testifying, on the ground that he was jointly indicted with the defendant, and was a party defendant on the record; but the Court overruled the objection, and the defendant excepted.   The witness then testified, in substance, as follows:

"I am 20 years of age; came from Missouri to Conway county, and thence to Yell county, in September, 1879; I know the defendant and James P. Holland.   On Wednesday before the killing of James, I visited Casey and Holland, at Holland's gin, in Carden bottom, in Yell county; stayed there with them awhile and returned to Hudspeth's to pick cotton, with whom I engaged to pick cotton as I went up to Carden bottom from Conway county.   Before leaving them I promised to return Saturday.   They were going to Dardanelle Friday.   On Saturday evening I returned to see Casey and Holland, at Holland's gin, Joe Koker going with me.   About sundown Joe Koker returned to Hudspeth's, promising to return the next morning, and we were all to spend Sunday together.   Casey and myself went to Holland's house, and afterwards, about dark, we and Holland went to the gin, and Holland brought out a bottle of whisky, and we sat down on a log, and Holland said that he and Casey had a good thing that they had been at work at for six months; that one Burgess James had about fifteen hundred dollars, mostly in gold, that he carried about him all the time, and the way to get it was to kill him and take it from him.  Casey said yes, that was so.  The conversation became general, and I can only state the substance of it.  They asked me if I would go in with them and help them get it. I told them I did not like to go into anything of that kind, that I could not get out of.   They then said that I need not be afraid to go into it; that they would get me out of it. Holland said he had two beds in his house; he would move one of them into the kitchen, and Casey would come there

and sleep on the bed in the kitchen ; and that I could go out and kill James and come back and sleep with Casey, and they would both swear that I had stayed there all night. We then broke up, and Casey and I went to George Guest's and stayed all night. We all three met next morning (Sunday) at the gin, to make further arrangements for me to go and kill Burgess James, and get his money. They again assured me that they would get me out of it if I would kill him. I had no pistol, and Casey got his (a Smith & Wesson, calibre No. 32) and gave it to me, and Holland gave me some money. The pistol was dark-colored, varnished handle, and Casey said it once belonged to Rube Cole, the Sheriff.

"We then spoke about Koker intending to come there the next morning, and Casey said he would give him a scare and make him leave. They told me I would find James at Phillips' gin, or at the widow woman's house there. We then separated, and I went up the river. I went to the widow woman's house, and found that James had gone out home. I then went in the direction of his house, and met him a little before sundown and returned to the bottom with him. It was dark before we got into the bottom. On the way we stopped several times to rest. I told James that my name was Virgil James ; that I was a cousin of his from Mississippi, and he recognized me as his cousin. Casey and Holland had told me to do this, giving me the names of James' relations in Mississippi. The last rest we made I had made up my mind to kill him, but didn't wish to do it without telling him of it. I pulled out the pistol and told him I was going to kill him with it. He jumped up and run towards me, and then turned from me, and when he had got about ten steps from me I fired the first shot, then the second, third, fourth and fifth, he running all the time. I then run up on him and knocked him down

with the pistol, and as he was trying to get up I struck him several blows on the head with the pistol. He was hallooing, and I choked him to stop him, until he was dead; and then took his money, amounting to one hundred and thirty-odd dollars, from his pants pocket. I then left immediately, and went to Holland's house. It was about ten or eleven o'clock Sunday night when I killed James, and about three o'clock Monday morning when I reached Holland's house. I went into the kitchen where Casey was sleeping and woke him up and told him what I had done, and he got up and went out with me. Holland also got up and came out where we were. I told him also about my killing James and getting his money. They said it was all right; that they would stick to me, and die by me but what I should come out all right. Holland brought out a bottle of whisky, which he said he got at Atkin's Station on Sunday on purpose for us, of which we all drank. Holland then went into the house and got me something to eat. I told them where I had left James' body, as near as I could describe the place, and they said if they thought they could find it they would go and throw it in the river so it could not be found. We then struck a match and tried to count the money I got from James, but the match went out before we got through. We then went to the gin, and Casey and I stayed there until daylight, when Holland came out and said it would not do for us to stay there and let anybody see us. We then counted the money, and Casey put a $20 gold piece in his pocket. I kept the balance, because we did not have time to divide it. They then advised me to go out into a thicket, some four or five hundred yards in Holland's field, and Casey went with me and showed me the thicket, and then left me and went back. He and Holland were to come out where I was as soon after daylight as they could get off, and after sun-up Casey came out alone, and

told me there were so many around that they couldn't both come out together with safety, but they would come out at twelve o'clock and bring me some dinner and a change of clothing and a pistol, and we were then to divide the money. He then went back. After he left I went out under a walnut tree in the field and went to sleep, and slept until after twelve o'clock. When I waked up I saw Casey running from the thicket in the direction of George Guest's house. I also saw several men riding down the road toward the gin house. This gave me a scare, and I left the country immediately, and went to Missouri. I was arrested in Missouri.

"On my return, in custody of Messrs. Cole, Young and Quinn, deputy sheriffs, I voluntarily confessed to them my guilt in killing James, and implicated Casey and Holland. I also made confession to the prosecuting attorney, whom we met on our return, between Dover and Russellville, of my guilt of the murder of James, implicating Casey and Holland. The prosecuting attorney did not offer me any inducement or reward to make the confession, but stated that he, as prosecuting attorney, could not promise me anything, and that my statement or confession would probably be used against me. Neither Holland or Casey were present when these confessions were made."

"The killing of James occurred in Dardanelle District, in Yell county. The defendant's counsel objected to the witness' statements to the guards and prosecuting attorney going to the jury, but the objection was overruled, and he excepted."

The counsel then proposed to ask the witness the following question:

1. "Did not your attorneys tell you at Dardanelle, at the examining trial of Casey and Holland, that it would be to your interest to testify against Casey and Holland?" but the Court refused to allow this and other similar questions,

as to the advice of his counsel, to be asked, and defendant excepted.

The defendant then asked the witness as follows:

"Did not the deputy sheriffs who brought you back from Missouri tell you that they knew you were guilty, and you had better confess?"

2. "Have you not been informed that when a person turns State's witness, it is the policy of the Court to mitigate his punishment?"

The Court permitted the questions to be asked, but upon its own motion instructed the witness that in answering he was not bound to answer as to any information received from his counsel. To which instruction of the Court the defendant excepted.

George B. Guest, for the State, testified as follows:

"I reside on what is known as the Holland farm, in Carden bottom, in Yell county. I have known the defendant since March, 1879, when I employed him as a laborer on my place. The first time I ever saw the witness, Helphrey, was on Saturday evening, the twentieth or twenty-first of September, 1879, about sundown. He was sitting on a log in front of Holland's gin. He soon after came to my house with Ben Tennison, one of my laborers, and they went into the laborers' room. Soon after supper the defendant, Casey, came in and recognized Helphrey at once. After a few minutes' general conversation Helphrey and Casey left together, about dark, going towards Jim Holland's house, which is about 100 yards from my house. I soon after went to bed. After about an hour, or hour and a half, they returned and went to bed in the laborers' room. The next morning I saw them come out of the room and go over to Holland's before sun-up, and return to my house in about thirty minutes. After breakfast they returned to Holland's. I never saw Helphrey again until since his ar-

rest. I saw Casey that day no more until. about sundown, at the widow Tacket's.

"Casey's pistol was a fine Smith & Wesson six-shooter. I saw it in his coat pocket, where it was hanging up at the gin, on the Wednesday after the killing; saw nothing out of repair about it. I took it out of his pocket only far enough to recognize it by the handle. It was the only pistol I ever knew him to have. On Sunday night Casey did not sleep at my house. It was understood a few days before then that he was to board at Jim Holland's; but on the Monday night after, he did stay at my house. He had engaged to work for Holland at the gin, and was to board at Holland's. Only a narrow road separates my house from the gin, and I know that Casey fired the engine at the gin on Tuesday and Wednesday after the killing. Jim Holland was married to Matilda Tacket. He called her 'Tilda.' Casey was engaged to her sister—a stout, fat girl, called 'Lou.'"

Samuel Scruggs, for the State, testified as follows:

"I have known Casey since last March. I first saw Helphrey on the Wednesday afternoon before the killing of James. He came to where I was picking cotton for Mr. Collins, on the Holland farm, in Yell county; Casey was with him. They stayed about half an hour, and then went to Mr. Guest's. I next saw Helphrey on the Saturday evening before the killing of James, at Mr. Guest's. He said he came up to see Casey. I saw Casey the same evening, and remarked to him 'that he was not picking much cotton now;' and he replied, in a laughing way, that he was making more money than any of us; was making five dollars to our one; didn't say how he was making it. I knew his only business was picking cotton, and other farm labor. About half an hour afterwards he said he was getting up a

$500 horse race. I don't know that the making of five times what we made had reference to the horse race.''

Joe Koker, for the State:

'' My age is 18 years; live in Carden bottom, Yell county, Arkansas. I know Helphrey; came to Carden bottom with him from Greasy Valley in Conway county, and stopped and went to work at Hudspeth's. On the Saturday evening before the killing of James, Helphrey and I went up to Holland's gin to see Casey; when we got there, Casey and Holland were absent, killing a beef; Helphrey said he wanted to see Casey, and would stay all night. I started back home, Helphrey telling me to come back Sunday morning, and we would have some fun up and down the river. Sunday morning George Mills and myself were going up to Holland's gin and met Casey, who told me that Helphrey told him to tell me to meet him in Greasy Valley as soon as I could get there; and Casey further told me that they were after Helphrey with a writ from Conway county, and he had left the night before. He took me aside from George Mills to deliver this message to me. I left for Greasy Valley immediately, and went to John Robinson's, where Casey said Helphrey would meet me; but Helphrey never came there, and I returned to Carden bottom Monday. When Helphrey and I went to Holland's gin Saturday evening, he did not have a pistol—at least, I saw none, and if he had one, it was small and concealed in his pocket. When Helphrey was in Greasy Valley, he most always carried a pistol—a large Remington pistol. He also had a small pistol—Colt's revolver. He carried these pistols because he was most always in a fuss. He afterwards sold the Colt's revolver. Helphrey and myself occupied the same room at Hudspeth's for three nights before we went to Holland's gin, and I never saw him have any pistol there. He had no baggage there.''

Casey v. The State.

Robert Thomas, for the State :

"I saw Helphrey for the first time on the Sunday that James was killed; he was on the road near William Phillips', and got there about ten o'clock A. M., and stayed about two hours. He had a Smith & Wesson pistol wrapped up in his coat, which he was carrying in his hand; I read the name on the barrel; the barrel was about five and a half inches long—a six-shooter, and like the pistol in court. He inquired for Burgess James—said he was his cousin, and he had heard he was in jail for playing cards, and he was going to try to get him out."

The State then proved by the attending physician of Burgess James that he was shot in three different parts of the body, and had nine cuts about the head, from a hard substance, that had corners and edge, and that he died from the effects of the wounds. The shots were from a pistol or gun carrying a small ball.

George Mills, for State :

"On the Sunday on which Burgess James was killed, about 9 o'clock A. M., I was coming up the river road in Carden bottom, in company with John Lewis and Joe Koker. We met the defendant, Casey, who stopped, and after a short conversation, took Joe Koker aside, and after an inter- view between them of some five or ten minutes, Koker turned and went back in the direction of Hudspeth's. Lewis and myself went on towards Holland's gin, until we got to Malone's; we stopped there, and soon after Casey came on and stopped there too ; soon after he came up, Lewis and myself went on to Holland's gin, leaving Casey at Ma- lone's."

Elbert Embry, for the State :

"I live at Atkins, in Pope county, about five miles from the Holland farm. On the Saturday before the Sunday on which Burgess James was killed, the defendant and James

P. Holland came to my drug store and bought three quarts of whisky. Holland was in the habit of buying whisky from me, generally every week."

The State then proved by George Cole, the deputy sheriff and jailer at Dardanelle, that while the defendant, Casey, was in jail, he, Cole, took his letters from the postoffice and delivered them to him, always opening and examining their contents before delivering them. That in December, 1879, he got a letter out of the office addressed to the defendant at Cabin Creek postoffice, and forwarded to Dardanelle from that office. It was postmarked "Carden Bottom, Ark." The witness produced the letter, and he and other witnesses proved that the body, address and signature were in the hand-writing of James P. Holland. It was mailed at Carden Bottom, July eighteenth, 1879, and received at Dardanelle December twenty-third, 1879.

The Court, against the objections of the defendant, allowed the letter to be read to the jury, as follows:

"CARDEN BOTTOM, ARK., July 18, 1879.

"W. A. CASEY:

"*Dear Friend*—I seat myself to write you a few lines, to let you know bisness. Bill he is still on the river, but is going to his place Sunday to stay. You keep cool. I will write to you Monday or Tuesday, and tell you all about it. Bill, this leaves all well but me. I have got the tooth ache the worst kind. Every thing is all wright, the old lady has moved to the Gee house. I am here by myself and Tilda. You kneed not be afraid to come any time you get ready. So I will close as the mail is coming.

"Yours truly,

"J. P. HOLLAND."

"P. S.—I am going up to-morrow or next day. You believe me all is quiet. I told all you was gone to Joplin, Mo.                                                   W. A."

Casey v. The State.

"Bill your girl is fat and wants to see you. When you read this burn it up and answer it. Be shure and do both. When I write for you to come you must come a hoping.

"Bravely as ever,

"JAMES P. H———D."

W. P. Phillips testified that Burgess James worked for him two months in 1879, on his farm on the river, and left there to go upon his own farm to stay, in July, 1879.

The defendant proved by a number of witnesses residing in Missouri, that they well knew Charles G. Helphrey in Missouri, before he came to Arkansas, about 1878. He lived in their neighborhood many years, and his general character for truth and immorality in the neighborhood was bad, and they would not believe him on oath. He was raised there, and was, at the time of their testifying, about twenty years old.

The defendant then offered to prove by the wife of James P. Holland that on the Sunday night on which Burgess James was killed, her husband, James P. Holland, was very sick, and she sat up with him all night, and knew that he did not go out of the house during the night, and that Charles Helphrey did not come to her house during the night; and that said Holland did not go to the gin house the next morning, as testified by Helphrey. He was sick several days, and she called in a physician for him Monday morning. That Casey had come to her house to board, in pursuance of an arrangement made for him to work for her husband in firing his gin, and a bed had been provided for him in a side room on Thursday or Friday before the killing of James, and he was boarding there, according to the agreement. But the Court excluded the witness, and the defendant excepted.

The defendant then offered to prove by J. G. Melton that on the Sunday on which the murder was committed he

met J. P. Holland. and Dr. Shockley coming, as he supposed, from Atkins, and asked them for a drink of whisky, and they both told him they had none; that they started from Atkins with two quarts, one of which they had lost by getting the bottle broken, and the other they had drank up. But the Court refused the testimony, and he excepted.

The testimony of other witnesses was introduced by the defendant, for the purpose of contradicting certain statements of Helphrey.

The Court gave to the jury, for the State, twenty-nine instructions; to the 22d and 23d of which the defendant objected and excepted. They are as follows:

22d. The want of corroboration in testimony not material, or contradiction, when immaterial, is of no consequence in determining the guilt or innocence of the defendant.

23d. While it is necessary that the State should prove that Burgess James was murdered by Charles G. Helphrey, it is also necessary that she should prove circumstances outside of the testimony of said Helphrey, tending to connect the defendant with the commission of said offense; and said circumstances, if so proven, are a sufficient corroboration of Helphrey's testimony, if they, in connection with his testimony, satisfy your minds beyond a reasonable doubt of the defendant's guilt.

The defendant asked for nine instructions; all of which the Court refused, and he excepted.

The Court, against the objections of the defendant, permitted the jury to retire during the argument of the instructions, and he excepted.

The jury found the defendant guilty of murder in the first degree. The defendant filed a motion in arrest of judgment, and for new trial, upon the grounds of his ex-

ception, taken during the progress of the cause, and because the verdict was contrary to law and the instructions of the Court, and was not supported by the evidence ; which being overruled, he excepted and filed his bill of exceptions, and obtained an appeal from one of the judges of this Court.

*Harrison & Byers*, for appellants :

The indictment demurrable. If good, it is joint against Holland, Casey and Helphrey ; and the last is not a competent witness against his co-defendants.

The Court erred in refusing to sustain challenges of the jurors, Carter and Huggins, for cause, thus compelling defendant to exhaust peremptory challenges. *Texas Court of Appeals 7, p. 519.*

Also in refusing to allow witness, Helphrey, to tell if he had been advised by his attorney to testify. The attorney alone is privileged.

Holland's letter, without proof of conspiracy, was not evidence against Casey. Besides, its contents may as well have an innocent meaning as the contrary  It was really the ground of the verdict.

The witness, Mrs. Holland, was competent to testify, upon severance, in favor of Casey. *Stanton's Ky. Digest, p. 448, sec. 90; Wharton's Crim. Law, top p. 769, 767–8; Greenleaf on Ev., sec. 335.* See *N. 2, p. 397, Note 5.*

The witness, Hall, should have told what he had heard.

The evidence of Melton was competent as part of the *res gestœ*, disproving Helphrey's statement.

Casey is not connected with the killing by anything outside of Helphrey's testimony.

The 22d instruction tended to mislead the jury. The 23d, good as far as it goes, but there was no proof of criminal connection ; acts, innocent in themselves, cannot fix guilt, unless connected with the case. 1 *Green's Crim. Law Re-*

ports, 749 ; 32 *Annual Reports*, 599 ; 7 *Texas Ct. of Ap.*, 445. Confessions of accomplice not sufficient. 12 *Am. Decisions*, *p.* 340.

The instructions asked for defendant should have been given. *Am. Reports* 32, *p.* 174 ; *State* v. *Lyon*, 81 *N. C.*, *p.* 600 ; *Roscoe's Crim. Ev.*, 159–160 ; 2 *Russ. on Crimes*, 958–59–60 ; *Bish. Crim. Prac.*, sec. 1076, *and note* 1 ; *secs.* 1073–74–78–79.

*C. B. Moore, Attorney-General*, for appellee :

Helphrey was not jointly indicted, but separately. His connection with the crime is only descriptive.

The jurors, Collins and Steinberg, were properly held competent.

The instructions were proper.

The letter admitted, although written sometime before the killing, tended to ·connect Casey and Holland in the crime, and was competent for what it was worth.

Mrs. Holland's testimony rightfully excluded. *Collier* v. *State*, 20 *Ark.*, 36.

There was no error in the exclusion of the testimony of Hall and Melton.

Defendant's instructions were properly refused.

HARRISON, J. The motion in arrest of judgment was properly overruled.

The guilt of Helphrey is averred, and the facts and the circumstances of the murder are stated in the indictment with the same directness and certainty required to charge him with the commission of it, if he alone had been concerned in the perpetration of it ; and it charges with like directness and certainty, the appellant and Holland with having, before the commission of the crime, feloniously and with malice aforethought incited, procured, aided, counseled, hired and commanded him to do and commit it, and nothing more

Casey v. T e State.

was or could be necessary to charge them as accessories. 2 *Bish. Crim. Proced.*, *Secs*. 7–11.

It was the province of the Court to determine in the ex- 1. Discre-
tion of
·ercise of a sound discretion, whether there existed such a court in
rejecting
·state of mind on the part of the persons called as jurors in juror.
(See ans-
the case and challenged by the appellant for actual bias, wer of ju-.
rors, p. 89)
that they could not, if chosen, give him a fair and impartial
trial, and disqualified them as jurors, and unless there had
been an abuse of its discretion, which we cannot say there
was, we have no authority to overrule its decision. *Gantt's*
*Digest Sec.* 1910; *Benton* v. *The State* 30 *Ark.* 328;
*Wright* v. *The State, MS. Opinion.*

Helphrey was a competent witness for the State. It isa 2. WIT-
NESS:
well settled rule of the common law that an accomplice who Accom-
·is not indicted, or is separately indicted, and though he has plice.
been convicted, if sentence has not been passed upon him, is
·a competent witness. 1 *Bish. Crim. Pro.*, *Secs.* 1166,1167; .
1 *Whar. Crim. Law*, 783; 1 *Green Ev. Sec.*, 379. And it
·is expressly provided by section 2479, Gantt's Digest, "that
·in all cases where two or more persons are jointly or other-
wise concerned in the commission of any crime or misde-
meanor, either of such persons may be sworn as a witness
in relation to such crime or misdemeanor, but the testimony
given by such witness shall in no instance be used against
him in any criminal prosecution for the same offense."
*The State* v. *Quarles* 13, *Ark.* 307; *Cossart* v. *The State*
14, *Ark.*, 539; *Pleasant* v. *The State* 15, *Ark.* 649.

And we can see no reason why he should not have been
permitted to state when testifying, that he had previously
made a confession of the crime to the Prosecuting Attorney,
in which he had told him of the appellant's, and Holland's
·complicity in it.

The advice given him by his counsel he could not be com- 3. ——:
Evidence.
pelled to disclose. It was within the privilege of confiden- Advice of
counsel.

Casey v. The State.

tial communications.  *Bobo* v. *Bryson*, 21 *Ark.* 387 ; *Big-*
*ler* v. *Reyher*, 43 ; *Ind.* 112 ; *Hemenway* v. *Smith et al*, 28
*Verm.*, 701 ; 1 *Green Ev.*, *Sec.* 240 *a*.

Mr. Wharton says :   '' The question whether a client can
be compelled to disclose his confidential communications to
his legal adviser draws peculiar interest from the Statutes
enabling parties to be called as witnesses by their oppo-
nents,'' and very justly remarks :   '' It is obvious the guard
against the disclosure of such communications by counsel
would be a mockery, if the client could be compelled to dis-
close that as to which counsel's lips are sealed.   It would
be absurd to protect, by solemn sanctions, professional com-
munications when the lawyer is examined, and to leave
them unprotected at the examination of the client.''   1
*Whart. on Ev.*, *Sec.* 583.

And he was very properly told by the Court that he was
not required to disclose any information he had receiyed
from his counsel.

4.  EVI-     The letter written to Casey as the evidence conduced to
DENCE:
Declara- prove, by Holland, was admissible against him only as the
tion of ac-
complice. declaration or act of an accomplice, upon the principle that
where several are engaged together in the commission of an
unlawful act, the declaration or act of one in reference to
or in pursuance of the common object is in contemplation
of law, the declaration or act of all of them.   But before
it was introduced, other evidence than that of Helphrey im-
plicating Holland, should have been produced.

The testimony of Helphrey was not sufficient for that
purpose.   ''A conviction can not be had,'' the statute
says, ''upon the testimony of an accomplice unless corrobor-
ated by other evidence tending to connect the defendant
with the commission of the offense, and the corroboration
is not sufficient if it merely shows that the offense was

committed and the circumstances thereof." *Section* 1932 *Gantt's Digest.*

Without evidence, therefore, connecting Holland with the murder, corroborative of that of Helphrey, the letter, however irrefragable in itself as evidence of his complicity, was of no higher grade than *hearsay*. And, as there was no such proof made, either before or after its introduction, it was not competent evidence.

Though there is much conflict in the authorities, it is settled in this State by the decision in *Collier* v. *The State*, 20 *Ark.*, 36, that the wife of one indicted with the defendant on trial, is not a competent witness for the latter; which decision we adhere to.

5. WITNESS: Wife of co-defendant in-competent.

Though the declarations of Holland, if he had been proved to have been connected with the crime, might have been used against him, they were not competent evidence for the appellant. The evidence of the witness Melton, offered by the appellant, as to what Holland may have told him, on the day of the murder, about having no whisky, was, therefore, properly excluded.

6. EVIDENCE: Declarations of accomplice.

The first of the instructions objected to by the appellant, the twenty-second in the series of those given at the instance of the State, so far as it related to the contradiction of the testimony of Helphrey, was not correct, if there had been evidence on which to base it; for if Helphrey was contradicted by any other witness, though in an immaterial matter, that is, as we understand the meaning of the instruction, in a matter not tending to connect the defendant with the killing, such contradiction might have tended to weaken his testimony, and to impair his credit with the jury; but as there was, in fact, no contradiction of it in any particular, the appellant was not in any way prejudiced by the instruction.

7. WITNESS: Contradiction in immaterial matter, material.

To the other, the twenty-third, we are unable to see any

objection, and none has been insisted upon or suggested
here.

8. INSTRUC-
TIONS:
Repeating The *first, second, third* and *sixth* asked by the defendant
were substantially the same as the *twenty-third* of those al-
ready given for the State ; the *fourth* the same as the *twenty-
sixth;* the *fifth* was contained in the. *fourteenth, fifteenth,*
*seventeenth* and *eighteenth;* and the *eighth* in the *fourteenth;*
and as they would have tended to unnecessary prolixity in
the charge, and could have served no good purpose, they
·were properly refused.   ·

   The jury were told by the Court, in the twenty-first in-
struction given, that they could not convict the defendant.
upon the testimony of Helphrey, unless it was corroborated
by other evidence tending to connect the defendant with the
commission of the murder, and that the corroboration was.
not sufficient if it merely showed that it was committed, and
the circumstance of it, the Court so in effect telling them
that the law impeached him, and they must have known
from the atrocity of the crime he had committed that he
was not a creditable witness.   It could not go further and
tell them that some particular motive or inducement might.
have influenced his testimony, and as to which there was no
evidence ; and if the law be as stated in the seventh instruc-
tion asked by the defendant, but as to which we do not.
deem it necessary or proper to express an opinion, it was.
properly rejected.

9." PRAC-
TICE.
Retiring
jury du-
ring argu-
ment of
instruc-
tions.
Requiring the jury to withdraw from the court-room
whilst the instructions ·were being argued and settled was a
matter of practice, only within the discretion and control of
the Court.   We cannot see or imagine any impropriety in
it, or how the appellant could have been thereby prejudiced.

   As the judgment must, for the error above indicated, be.
reversed, and the case remanded for a new trial, we do not.
deem it proper to make any remark upon the evidence,

further than to say that there was, in our opinion, competent and legal evidence corroboratory of Helphrey's, conducing to connect the appellant with the commission of the crime.

Reversed, and remanded for a new trial.