## DEAN *v.* STATE.

### Opinion delivered July 14, 1919.

1. CRIMINAL LAW—HOMICIDE—AGGRESSOR.—In a prosecution for homicide, where the killing occurred in a fight, it is a question for the jury, under the evidence, to determine who was the aggressor.

2. TRIAL—NUMBER OF INSTRUCTIONS ASKED—PRACTICE.—In requesting instructions counsel should succinctly present, in as few prayers as possible, the declarations of law applicable to the facts which the evidence tends to prove and which he considers essential to maintain his contentions. The practice of presenting numerous instructions repeating the same idea is not to be approved, but rather to be discouraged.

3. HOMICIDE—SELF-DEFENSE — CONDUCT OF DEFENDANT — INSTRUCTIONS.—In a homicide case, an instruction justifying the defendant's act on the ground that he might rightfully fear that he was in danger of his life or of great bodily harm, on account of the words and acts of the deceased, should also include the essential that defendant, in acting upon appearances of danger, must have done so without carelessness or fault upon his part.

4. EVIDENCE—HOMICIDE—TWO DEFENDANTS TRIED TOGETHER—RIGHT OF WIFE OF ONE TO TESTIFY.—A. and B. were separately indicted for the murder of C. Upon their motion the cases were consolidated and A. and B. were tried together. *Held,* the testimony of A.'s wife was incompetent and inadmissible.

5. WITNESSES—IMPEACHMENT—PROPER FOUNDATION FOR.—A witness may not be impeached unless the proper foundation for such impeachment is laid; so where T. was asked, on cross-examination, only the words of his conversation with one S., it is improper to permit S. to testify that the words spoken to him by T. were other than those testified to by T.

6. HOMICIDE—USE OF KNUCKS BY DECEASED—TESTIMONY OF EXAMIN-
ING PHYSICIAN AS TO NATURE OF WOUNDS RECEIVED BY DEFENDANT.—
In a prosecution for homicide, defendant pleaded self-defense.
Knucks were found on the body of deceased. *Held,* a physician
was competent to testify as to whether injuries inflicted on de-
fendant's head by deceased, were inflicted by knucks, where the
physician examined defendant shortly after the killing, although
the physician had only upon one former occasion examined wounds
made by the use of knucks.

7. EVIDENCE—HOMICIDE—THREATS MADE TO DEFENDANT'S WIFE.—
While a wife is not a competent witness in behalf of her hus-
band, in a homicide case, when defendant has plead self-defense,
he may testify to the effect that his wife had informed him of
threats that were made upon his life, by deceased and his asso-
ciates.

8. HOMICIDE — SELF-DEFENSE — THREATS BY DECEASED.—Where self-
defense is pleaded in a homicide case, testimony of threats by
deceased against the defendant and communicated to him, as
well as testimony of the general reputation of deceased for turbu-
lence and violence, is always admissible.

Appeal from Pike Circuit Court; *James S. Steel,*
Judge; reversed.

*Pinnix & Pinnix* and *McMillan & McMillan,* for ap-
pellants.

1.   The testimony shows a clear case of self-defense
and in defense of each other.

2.   The court erred in excluding the testimony of
Dr. McClure. His testimony was competent. 55 Ark.
593-8-9; 94 *Id.* 538-544; 1 Greenleaf on Ev., § 441 B; 5
Enc. Ed. 534; 74 Ark. 554-6; 34 *Id.* 520. Dr. McClure's
testimony tended to show that the deceased used brass
knucks, a deadly weapon, in the fight and tended to
strengthen the testimony of Pone Dean in all respects,
etc.

3.   It was error to allow Curtis Robertson to state
what he told Pone Dean that Curtis' wife told him about
what happened about the kiss. It was hearsay and also
incompetent.

4.   The court erred in holding incompetent the ad-
mission of Curtis Robertson that he had had trouble with
the Harpers about his wife.

5. It was error to hold incompetent the fact that Curtis Robertson run one of the Harpers out of the country on account of a grievance about his (Curtis') wife. This affected the credibility of Curtis Robertson. 53 Ark. 390.

6. The court erred in refusing to exclude the testimony of Mrs. Curtis Robertson as to what he did with his brother's pistol and about the kiss. 76 Ark. 489; 120 *Id.* 492; 69 *Id.* 653.

7. It was error to refuse to allow defendant to impeach witness Robert Toland. 52 Ark. 303; 109 *Id.* 206; 52 *Id.* 273; 80 *Id.* 587.

8. Evidence as to threats by the Robertsons against defendants was improperly excluded; the threats were communicated and believed; deceased's reputation as a dangerous man was well known. 97 Ind. 322; 130 *Id.* 227; 28 N. E. 1115; 63 Kan. 602; 124 Am. St. 1030; Elliott on Ev., § 3041; 1 Wigmore on Ev., p. 242, § 198; 38 Ark. 498; 85 S. W. 191. See also on self-defense and *res gestae,* 12 Ark. 782; 43 *Id.* 99.

9. Mrs. Pone Dean was a competent witness at least for M. H. Dean. 116 Ark. 334.

10. There are many errors in giving and refusing instructions. The jury was not properly instructed on the law of self-defense. 164 U. S. 546; 64 Ark. 144; *Jackson* v. *State,* 133 Ark. —; Kirby's Digest, § 1765; 76 Ark. 110; 120 *Id.* 201.

*John D. Arbuckle,* Attorney General, and *Robert C. Knox,* Assistant, for appellee.

1. No error in refusing to allow defendant to testify what his wife told him. His wife was not a competent witness and besides it was only "hearsay."

2. No error in refusing to allow Mrs. Pone Dean to testify. On motion the cases of Pone and M. H. Dean were consolidated and tried together. 42 Ark. 204; 37 *Id.* 67-85; 20 *Id.* 36.

3. There were no errors in giving or refusing instructions. 93 Ark. 409.

WOOD, J.   Pone Dean and his father, M. H. Dean, were indicted under separate indictments for the crime of murder in the second degree in the killing of Ford Robertson.   The defendants moved to have the causes consolidated and tried at the same time.   The motion set up "That both of said causes are of a like nature and relative to the same question and arose out of the same transaction and depend upon the same or substantially the same evidence."   The motion was confessed by the State's attorney and was granted by the court and the causes were consolidated.   The trial resulted in the conviction of Pone Dean of the crime of murder in the second degree and in the conviction of M. H. Dean of the crime of manslaughter.   From the convictions are these appeals.

On the 26th day of January, 1919, there was a fight between Pone Dean and M. H. Dean, on one side, and Curtis Robertson and Ford Robertson, on the other, which resulted in the death of Ford Robertson.   M. H. Dean was seventy-four years of age, and Pone Dean was thirty-six years of age.   Curtis Robertson was about twenty years of age and Ford and Robert Robertson were young men but elder brothers of Curtis.   The Deans and the Robertsons were farmers and lived in the same neighborhood.   Pone Dean married a sister of the Robertson boys.   Prior to his marriage Curtis Robertson had lived with Pone Dean and his wife and he also lived with them for a short while after his marriage but had moved to his own home a few months before the encounter.   The Deans and the Robertsons were on intimate and friendly terms until a month or more prior to the killing, when an incident occurred that engendered the enmity between the Deans and the Robertsons which finally culminated in the killing.   Pone Dean relates the incident as follows: "Curtis borrowed my shaving mug and brush, and one Sunday I went by the house and asked his wife for the shaving mug and brush, and asked her to kiss me, and she did, and I went home.   As I started off I told her for her and Curtis to come over that evening and we would go to the schoolhouse.   I went on home and was shaving,

and Curtis came along and stopped and talked awhile, and then went on towards home. In an hour or two he came back and came on the gallery with a pistol in his hand and stepped in and got his lantern and as he turned to go out he told me he wanted to talk to me. He walked about sixty yards from the house and he said, 'My woman said you asked her to kiss you.' I said, 'Yes, what are you going to do about it?' He said, 'He wasn't going to do anything and would let it drop where it was.' I told him that satisfied me if it satisfied him. There wasn't anything more said, and I went back to the house."

Mrs. Curtis Robertson, who was sixteen years of age, gives her version of the incident as follows: "Some month or more prior to the killing, Pone Dean came to our home, when my husband was gone. He came to the door and pushed the door open and said to me, 'Reckon anybody will catch us?' I says 'I don't know,' and he grabbed at me and asked me to kiss him. I told him, 'No, sir, I wouldn't do it.' He told me if I told it he would kill Curtis. Up to that time Pone Dean and his wife were very close friends of myself and husband. The day Pone Dean came up there and asked me to kiss him was Sunday. He came for his shaving mug and brush. I told my husband about it that evening. My husband told it to his brothers, Ford and Robert."

It appears from the testimony in the record that neither Pone Dean nor his father, M. H. Dean, considered that Pone Dean, in the kissing of Mrs. Robertson, had been guilty of any act reasonably calculated to arouse the intense enmity of the Robertson brothers toward him; while, on the other hand, the testimony tends to show that the Robertsons were mortally offended. Ineffectual efforts were made to reconcile the families, and the above is the condition of mind that existed between them when they attended preaching services at a schoolhouse in the neighborhood on the morning of the day of the fatal encounter, which was Sunday.

There was testimony introduced by the State tending to prove that the defendants provoked and were the ag-

gressors in the fight; while the testimony introduced for the defendants tended to prove the contrary. The testimony introduced by the State proved that Pone Dean killed Ford Robertson with a pocket-knife of a large size called a "granddaddy" barlow; that he drew this knife and rushed toward Curtis Robertson, who fled around the house with Dean pursuing him for a short distance, when he immediately returned; the testimony further tending to prove that in the meantime old man Dean was hitting Ford Robertson with a club; that he hit Ford Robertson three or four times, when Ford Robertson knocked him down with his fist, and by that time Pone Dean ran up and stabbed Ford Robertson in the back. On the other hand, the testimony introduced by the defendants tended to prove that Curtis Robertson was armed with a pistol and that Ford Robertson was armed with knucks and also had a pocket-knife; that words passed between Ford and Curtis Robertson and Pone Dean; that Curtis and Ford Robertson were approaching Pone Dean; that Curtis said, "If you want to fight, you son-of-a-bitch, get on me;" that Pone Dean saw Curtis' gun and started toward him, his purpose being to get close enough to keep Curtis from shooting him; that as he started for Curtis his father hit Ford and checked him; that after running Curtis around the house Pone Dean turned back, saw Ford knock his father down twice, whereupon he (Pone Dean) started on to Ford but before he got to him Ford turned, came about six feet toward him (Pone) ; that Ford had knucks and a knife in one hand and a club in the other and hit Pone Dean one lick with his knife and the next lick hit him on the head with the knucks and knocked him down, during which time Ford received at the hands of Pone Dean the fatal stabs with the knife.

(1) The testimony is voluminous and without setting out and commenting upon it in detail it suffices to say that it was a question for the jury, under the evidence, to determine whether or not Pone Dean and his father were the aggressors in the fight or whether or not Curtis and Ford Robertson were the aggressors.

It is the contention of the appellants that under the testimony adduced by them they acted in self-defense and in the defense of each other. It is the contention of the State, on the other hand, that the appellants brought on the fight and were the aggressors and that the killing of Ford Robertson by appellant Pone Dean was the result of malice on his part, but without the deliberation and premeditation necessary to constitute murder in the first degree. In other words, that the appellants, under the evidence, were guilty of murder in the second degree.

The principles of law governing the right of self-defense and the right of near relatives, such as father and son, to defend each other from assaults made with a deadly weapon with the intent to kill or inflict great bodily injury, are familiar and have been so often announced by this court that it could serve no useful purpose to reiterate them here. We find in the bill of exceptions the following:

"After the court had examined and given or refused all the instructions which were marked either given or refused on the margin thereof by the court, and the instructions had been read to the jury, counsel for defendants tendered to the court the instructions in the record which are neither marked given or refused. Thereupon, the court made the following statement: 'Gentlemen, you have three attorneys in this case for the defendants. When I asked that your instructions be submitted so I could examine them, you tendered me a set of instructions, and I examined them in connection with the set of instructions requested by the State and passed upon all your instructions and have given the instructions to the jury. Now you have tendered two other sets of instructions, which I cannot pass upon. You gentlemen should agree upon your instructions and submit them to the court and not submit three different sets of instructions."

(2-3) It appears that appellant's prayers for instructions contained sixty-nine separate statements of the law. While all the law applicable to a cause of this

kind cannot be covered in one independent declaration, yet a careful scrutiny of the independent and separate prayers for instructions presented in the three sets presented by appellants' counsel shows that in many of them the same idea is repeated many times. This manner of presenting prayers for instructions is not to be encouraged. Numerous instructions, many of them repeating the same idea, are well calculated, by their very multiplicity and repetition of thought, to confuse and mislead, rather than to enlighten, the jury. Counsel should succinctly present in as few prayers as possible the declarations of law applicable to the facts which the evidence tends to prove and which they consider essential to maintain their contentions. We have taken the pains, however, on account of the great importance of the issues involved, to carefully scrutinize the charge of the court, and we find that, when taken as a whole, it correctly declared the law as heretofore announced in numerous decisions of this court, and gave the jury a correct guide for their deliberations in determining the guilt or innocence of the appellants. Some of the instructions contain verbal inaccuracies and on that account are open to criticism. For instance, the seventh and eighth prayers for instructions, given at the instance of appellants, declared the law to be that the defendants had the right to act upon the circumstances as they appeared to the defendants and that if the language and conduct of the deceased were such as to induce in the mind of a reasonable man the belief, under all the circumstances existing, that they were in danger of death or great bodily harm at the instance of the deceased they would be justified in slaying him. These instructions omitted the essential that the defendants, in acting upon appearances of danger, must have done so without fault or carelessness on their part. But this idea was embraced in other instructions, and it was an omission, too, favorable to the appellants and of which they could not complain. It would be better form, however, for each instruction along this line to carry that qualification.

When the charge is taken as a whole, we do not regard it as calculated to mislead the jury and prejudice the rights of the appellants. In view of a new trial, however, which must be had on account of the error of the court in excluding certain evidence from the jury, the trial court will be under the necessity of again instructing the jury, when it will doubtless make corrections in the mere verbiage of some of the present prayers for instructions, if again offered, and will reduce their number so as to make a more concise and connected charge.

Those of appellants' prayers for instructions which announce correct principles of law and which were refused by the court we find were covered by other prayers which the court gave, either at the instance of the appellants or at the instance of the State.

A few of the cases in this court announcing the principles of law applicable to the facts of this record, to which the charge of the trial court as a whole conformed, are as follows: *Smith* v. *State,* 59 Ark. 132; *Carpenter* v. *State,* 62 Ark. 286; *Elder* v. *State,* 69 Ark. 648; *Lee* v. *State,* 72 Ark. 426, 436; *Pratt* v. *State,* 75 Ark. 350; *Mabry* v. *State,* 80 Ark. 345; *Wheatley* v. *State,* 93 Ark. 409; *McDonald* v. *State,* 104 Ark. 317.

(4) There was no error in refusing to allow the wife of Pone Dean to testify, although Pone Dean and his father, M. H. Dean, were indicted for the same offense under separate indictments. Their motion to consolidate sets up "that both of the causes were of like nature and relative to the same question and arose out of the same transaction, and depended upon the same or substantially the same evidence." The motion was tantamount to a request on the part of the appellants for a joint trial and an admission on their part that the offense, if committed at all, was jointly committed. Under such circumstances the wife of Pone Dean, who was incompetent to testify as a witness in his behalf on his trial, could not well give testimony in the cause in favor of M. H. Dean that would not also inure to the benefit of her husband. The appellant M. H. Dean, therefore,

waived any right he may have had, if any, under the circumstances to the testimony of Mrs. Pone Dean. See *Carr* v. *State,* 42 Ark. 204; *Carey* v. *State,* 37 Ark. 67; *Collier* v. *State,* 20 Ark. 36.

Robert Toland, a witness for the State, on his direct examination, testified that Pone Dean ran up and stabbed Ford Robertson in the back. On cross-examination he was asked the following questions: "Q. Did you undertake to tell him, F. W. Short, and Mr. Coleman there at the time (at the Short house the night after the fatal encounter) about how this fight went off?" The witness answered, "Yes, I told them just how it occurred." "Q. You told them just like it occurred here?" "A. Yes, sir."

Later the witness Short was called and was asked these questions concerning the conversation between him and witness Robert Toland: "Q. Did he, in making his statement to you that night, say that Pone Dean stabbed Ford Robertson in the back?" The witness answered, "No, sir; he didn't say that. He said, 'Went to fighting with their knives.'"

(5) The court excluded the testimony of the witness Short, and there was no error in the ruling. The witness Toland, whose testimony the appellants were seeking to impeach by the witness Short, was not given an opportunity on his cross-examination to hear what the witness Short had said were his statements. He was merely asked if he had not discussed the case with Short and Coleman and if he had not told them how the fight went off and if he had not told them that it went off just like it occurred here. No proper foundation was laid for the impeachment of the witness. *Jones* v. *State,* 101 Ark. 439.

(6) Doctor McClure, who was called as a witness for the State, testified that he was a graduate of medicine and surgery, having taken his degree from Tulane University. He testified that he examined the body of Ford Robertson on the day he was killed, and testified as to the nature of the wounds. He also, on the same

day, examined the wounds on Pone Dean.  He found two
wounds, each probably about half an inch long about an
inch apart, one on the fore part of his forehead at the
edge of the hair, and the other one on the left side, and
another cut wound on his elbow, almost right in the elbow
about a quarter of an inch long.  He stated that they
took a pair of brass knucks and a knife off the body of
Ford Robertson and he described each of these weapons.
In the course of his examination he stated, in answer to
questions, that he did not think he had ever examined
any knuck wounds more than one time.  He was asked,
"Could you tell from the examination the cause of the
wounds on his head," and answered, "I think not."  He
stated that he did not think the wounds on Pone Dean's
head were made by naked knuckles.  He was asked, "As
a physician can you tell whether or not that wound was
made with a metal instrument?" and answered, "Some-
times you can and sometimes you can't."  He stated
that the wound went to the bone.  Further along he was
asked the question, "After you had seen the knucks
taken from Ford and comparing that with the print of the
wound on the forehead of Pone Dean, did that knucks
about fit that wound?"  And the further question, "Did
you, in your mind, compare the knucks and size of the
knucks with the wound and size of the wound?  Did you
make any comparison in your mind as to them?  You
saw both?"  And the further question, "In your opinion,
Doctor, was the wound on the forehead of Pone Dean
caused by those knucks or similar to those?"

The court refused to allow the witness to answer
these questions on the ground that the witness had not
qualified himself as an expert about knuck wounds.  The
court also refused to allow this witness to testify to the
effect that in his opinion the wounds on Pone Dean's
head were made by the metal knucks.  Now, the testi-
mony of the witnesses for the State who were eye-wit-
nesses to the fight tended to prove that Ford Robertson
was not using metal knucks in the fight.  Curtis Robert-
son stated that he met his brother coming around the

corner of the house after the fight holding his side, walking along by the side of the house, and "He did not have any weapons, such as a knife or knucks at the time." Robert Robertson testified: "I did not at any time during the difficulty see Ford with a knife or pair of knucks. * * * Ford struck the old man and knocked him down; he hit him with his fist was all I saw. I did not notice any knife, weapon or knucks about Ford at that time." Robert Toland testified: "He (old man Dean) hit him (Ford) some three or four times, and then Ford Robertson knocked the old man down with his fist. I couldn't tell whether Ford had anything in his hand."

The witness, Vettetow, the preacher, testified that he did not see any part of the fight; after he got out of the house he saw the Deans and Curtis and Ford Robertson. Pone was standing at one corner of the house with his knife in his hand, a "granddaddy" barlow, and the old man, who was close to his son, had a stick in his hand. Curtis and Ford Robertson were fifteen or twenty feet from the Deans. He did not see anything in their hands. Another witness, who said he saw Pone Dean draw his hand with a knife and make a stroke and start at, or toward Ford Robertson, also testified that he "did not see either one of the Robertsons with a knife or pistol that day." M. H. Dean testified: "I saw Ford Robertson with knucks in the house. He had them after he went to the door. Ford Robertson hit me with knucks, one lick was on the side of the head at the edge of the ear, and the other lick was on the cheek. The wound was swollen ten days. Pone was injured on the side of the head with cuts and his wounds made him mighty weak, and he fainted there on the ground." Pone Dean testified: "I came back to protect my father, and before I got there Ford came toward me with his knife and knucks and a club. * * * He had his knucks in one hand and a knife in the same hand and a club in the other hand, and he hit me one lick with his knife, and I dodged the next lick, and the next lick he hit me on the head with his knucks, and that was the winding up of the fight."

The undisputed evidence proved that metal knucks were found on the dead body of Ford Robertson. But it was exceedingly important to the rights of the appellants to prove, if it could be done, that Ford Robertson had metal knucks just before and while he was engaged in the fight and that he was using the knucks in the fight. Now the testimony of Doctor McClure, if admitted, would have tended to prove that Ford Robertson used metal knucks during the fight, and in this way would have tended to corroborate the testimony of the Deans, and to discredit the testimony of the witnesses for the State that tended to prove that he did not use knucks. If it were a fact that Ford Robertson had metal knucks and was using them, this might justify or excuse the Deans in the use of force which otherwise they would not have been justified or excused in using. So the issue as to whether or not Ford Robertson was using metal knucks at the time he received the fatal wounds would be absolutely essential to the rights of the appellants, not only on the question of justification, but also on the question of the degree of guilt and the measure of punishment. The exclusion of the testimony, therefore, if competent, was highly prejudicial. Was it competent?

The witness qualified as an expert physician and surgeon. He had personal observation, not only of the wounds on Pone Dean, but also of the knucks that were found upon Ford Robertson's dead body. While he did not make a comparison by fitting the knucks over the wounds, yet, from his knowledge of the looks of each, he was able to make the comparison in his mind, and was of the opinion, from the character of the weapon found and the nature of the wounds produced, that the latter were caused by the former. In *Brown* v. *State*, 55 Ark. 593, 598, speaking of the testimony of an expert physician and surgeon, we said: "He may also give his opinion as to the nature of the instrument which produced a particular wound, the force required to produce it, and whether a given injury could have been inflicted by a weapon of a particular description." While the witness

had only observed a metal knuck wound one time this was sufficient to show that he had some experience with such wounds, and the results from wounds and the treatment of same were in the line of his profession and qualified him to give his opinion, both as to the nature and result of the wounds as well as the kind of weapon that produced them. See also *Miller* v. *State*, 94 Ark. 538.

(7-8) The court erred in refusing to permit Pone Dean to testify that he received information from his wife that the Robertsons had made threats that they were going to run him out of the country or kill him. While a wife under our statute is not a competent witness in behalf of her husband, that rule does not exclude the testimony of a defendant to the effect that his wife had informed him of threats that were made upon his life. The defendant is a competent witness in his own behalf and he may give testimony like any other witness concerning any fact that is relevant to the issue. Whether or not threats have been communicated to a defendant in a case like this is a substantive and affirmative fact pertinent to the issue, and no one could be more competent to establish the fact than defendant himself. The appellants had adduced testimony tending to prove that a pistol was seen on Curtis Robertson while in the church, and that Ford Robertson also while in the house was seen with metal knucks; that their attitude there was most unfriendly, and after they passed out of the church that they became the assailants. There was a decided conflict in the evidence as to all these matters. The issue was sharply drawn as to whether appellants acted strictly in self-defense and in defense of each other, and were, therefore, justified in the killing, or, if not, of what degree of punishable homicide under the circumstances were they guilty. Where such are the issues, testimony of threats by the deceased against the defendant and communicated to him, as well as testimony of the general reputation of the deceased for turbulence and violence, is always admissible. As is said in *Palmore* v. *The State,* 29 Ark. 248: ''Threats, as well as the character of the

deceased, are admissible when they tend to explain or palliate the conduct of the accused. They are circumstantial facts which are a part of the *res gestae* whenever they are sufficiently connected with the acts and conduct of the parties as to cast light on that darkest of all subjects, the motives of the human heart." See also *Bell* v. *State*, 69 Ark. 148; *Smith* v. *United States*, Book 40, U. S. Supt. Ct. Reports (L. E.), p. 627.

For the errors indicated the judgment is reversed and the cause is remanded for new trial.